UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CASE NO: 23-CV-02554-SDM-JSS

**THE REHAB DEPARTMENT, LLC**, a
Wyoming Limited Liability Company,

      Plaintiff,

v.

**ARK POST ACUTE NETWORK, LLC,
CAMBRIDGE SIERRA HOLDINGS, LLC
d/b/a RECHE CANYON REHAB AND
HEALTH CARE CENTER, BIRDMONT
HEALTH CARE, LLC d/b/a
CARRINGTON PLACE AT
WYTHEVILLE, EAST LAKE REHAB &
CARE CENTER, LLC d/b/a TRINITY
REGIONAL REHAB CENTER, LA OLD
HAMMOND HWY, LLC d/b/a PINES
RETIREMENT CENTER OF BATON
ROUGE, CARRINGTON PLACE
REHAB-NURSING, LLC d/b/a
CARRINGTON PLACE OF ST. PETE,
ESSEX REHAB & CARE CENTER, LLC
d/b/a CARRINGTON PLACE OF
TAPPAHANNOCK, BOTETOURT
HEALTH CARE, LLC d/b/a
CARRINGTON PLACE AT BOTETOURT
COMMONS, LA WESTFORK, LLC d/b/a
WHITE OAK POST-ACUTE CARE, LA
FIRST STREET, LLC d/b/a SPRINGHILL
POST ACUTE & MEMORY CARE, and
NORFOLK AREA SENIOR CENTER,
LLC d/b/a GREENBRIER REGIONAL
MEDICAL CENTER,**

      Defendants.

_____/

## AMENDED COMPLAINT

Plaintiff, THE REHAB DEPARTMENT, LLC, a Wyoming Limited Liability Company ("Plaintiff" or "TRD"), by and through the undersigned counsel, hereby sues Defendants, ARK POST ACUTE NETWORK, LLC ("ARK"), CAMBRIDGE SIERRA HOLDINGS, LLC d/b/a RECHE CANYON REHAB AND HEALTH CARE CENTER ("Reche Canyon"), BIRDMONT HEALTH CARE, LLC d/b/a CARRINGTON PLACE AT WYTHEVILLE ("Birdmont"), EAST LAKE REHAB & CARE CENTER, LLC d/b/a TRINITY REGIONAL REHAB CENTER ("Trinity"), LA OLD HAMMOND HWY, LLC d/b/a PINES RETIREMENT CENTER OF BATON ROUGE ("Pines"), CARRINGTON PLACE REHAB-NURSING, LLC d/b/a CARRINGTON PLACE OF ST. PETE ("St. Pete"), ESSEX REHAB & CARE CENTER, LLC d/b/a CARRINGTON PLACE OF TAPPAHANNOCK ("Tappahannock"), BOTETOURT HEALTH CARE, LLC d/b/a CARRINGTON PLACE AT BOTETOURT COMMONS ("Botetourt"), LA WESTFORK, LLC d/b/a WHITE OAK POST-ACUTE CARE ("White Oak"), LA FIRST STREET, LLC d/b/a SPRINGHILL POST ACUTE & MEMORY CARE ("Springhill"), NORFOLK AREA SENIOR CENTER, LLC d/b/a GREENBRIER REGIONAL MEDICAL CENTER ("Greenbrier") (the "Facility Defendants," and collectively with ARK, the "Defendants"), and states:

## INTRODUCTION

Defendants have systemically and uniformly failed to honor its prompt payment obligations under 42 U.S.C. §§ 1396a(a)(37) and 1396u-2(f), otherwise known as the

Medicaid Act.  Notably, this dispute arises from Defendants' refusal to remit payment to Plaintiff for reimbursement of services provided to Medicaid beneficiaries under the Medicaid Act (the "Medicaid Act").

In sum, the Act provides that Medicaid beneficiaries eligible for coverage are not liable for payment of services provided under the Act.  The Medicare/Medicaid program, which provides medical insurance for the aged and disabled, is administered by the Center of Medicare and Medicaid Servies ("CMS"), a division of the U.S. Department of Health and Human Services ("HHS"). Specifically, under Parts A and B of the Act, funds from the Federal Supplementary Medical Insurance Trust Fund are paid directly to providers for each qualifying service provided to the beneficiary. *See* 42 U.S.C. §§ 1395f(b), 1395g(a), and 1395l(a). The funds may be paid by intermediaries or carriers contracted by CMS to process claims and disburse federal funds. *See* 42 U.S.C. §§ 1395h(a), 1395u(a). Under Part C, Medical Health Care Organizations ("MHCO"), receive payments from CMS to reimburse services providers for services provided to beneficiaries eligible under the Act.

Here, Defendants are Skilled Nursing Care Facilities ("SNF") under contract with CMS to provide medical services to beneficiaries eligible under the Act.  Pursuant to their contractual obligations with CMS, Defendants are to provide coverage for qualified and eligible beneficiaries and submit particular information pertaining to the services provided to receive reimbursement for same.  Defendants, however, do not perform such services, rather, Defendants have retained and entered various service contracts with Plaintiff to perform the services for the eligible beneficiaries.  In turn,

Plaintiff had to promptly submit all the paperwork required for reimbursement to Defendants by CMS.  Plaintiff timely complied with such obligations in order for Defendants to seek reimbursement for services provided from the respective agencies under the CMS umbrella. Defendants indeed submitted said reimbursement and were duly paid by the CMS .  Accordingly, pursuant to the Act, Defendants were required to promptly remit payment to Plaintiff for reimbursement of the services provided, yet failed to do so.

Rather, in direct violation of the prompt payment provisions of the Act, and through false claims, Defendants seek to convert the reimbursed funds for their own benefit without remitting payment to Plaintiff, particularly because, Defendants claim, despite a lack of legal support for such a position, that because Plaintiff received Federal PPP loans throughout the COVID-19 Pandemic under the CARES Act, such payments somehow obviate Defendants from satisfying their contractual obligations to Plaintiffs.  Perhaps most egregiously, Defendants have taken the position that notwithstanding the fact that the covered services **were** in fact provided to Defendants, in addition to Defendants representations to the Federal Government that such services were provided and subject to reimbursement, Defendants nevertheless contend  that Plaintiffs are not entitled to payment for services provided.  Put more simply, Defendants have systematically failed to make the required payments and reimbursement to Plaintiff, essentially passing on those expenses to the Medicaid recipient.

The overriding purpose of the prompt payment provisions is to assure that

Medicaid beneficiaries are not held liable for payment of services provided and covered under the Act. Without the provisions in the Act establishing a prompt payment for services provided and likewise establishing a private right of action against SNCF's, there would exist no mechanism to ensure that SNCF's hold up their end of the bargain and pay the medical expenses associated with services to eligible beneficiaries. Notably, district courts have specifically held that the prompt payment provisions of §§ 1396a(a)(37) and 1396u-2(f) create a cause of action because it specifically identifies "a discrete class of beneficiaries" – i.e., healthcare providers, such as Plaintiff here.  *See Appalachian Reg'l Healthcare v. Coventry Health & Lif Ins. Co.,* 970 F. Supp 2d 687, *27 (E.D. KY., 2013).  Courts have further held that the requirement for claims payment procedures "ensuring that a specific percentage of services are paid within a specific period of time, constitutes right-creating language because the provision is neither vague nor amorphous in imposing a binding obligation." *Id.*

Accordingly, Plaintiff has been deprived of its rights under Federal law to receive payment for services provided to Medicaid beneficiaries, which has necessitated the filing of the instant action. Notably, federal courts have previously found that Medicaid service providers have a private right of action under 42 U.S.C. § 1983 to enforce Medicaid's Section 1396u-2(f)'s prompt payment to Medicaid service providers.  *See Saint Anthony Hosp. v. Eagleson*, 40 F. 4th 492, 22 U.S. App. Lexis 18438, 113 Fed. R. Serv. 3d 322 (7th Circuit, July 5, 2022) (Holding, "[t]he district court's dismissal of Count One was reversed because appellant had alleged a viable right **under** 42 U.S.C. § 1396u-2(f) to have HFS act to try to ensure timely payments from

managed-care organizations, and that right was enforceable in this 42 USC § 1983 actions against HFS Director in her official capacity").

Therefore, Plaintiff has a private cause of action against Defendants, acting under the Medicaid Act, to require compliance with federal law regarding payments to the providers for services rendered.

## QUESTION PRESENTED

Whether the Nursing Care Facility of a Medicaid Organization contracted with a CMS has the discretion to modify the payment requirements and/or refuse payment to a diect medical service provider, who performed services to a Medicaid beneficiary, in violation of the Medicaid Prompt Payment provisions, namely, 42 U.S.C. §§ 1396a(a)(37) and 1396u-2(f), because the service provider received Federal PPP loans as a form of COVID-19 relief under the CARES Act, is a question of Federal law, not state law.

## PARTIES, JURISDICTION, AND VENUE

1.     Plaintiff TRD is a Wyoming limited liability company, with its principal place of business located at 2513 Beach Boulevard South, Gulfport, FL 33707.  The sole member of TRD is a resident and citizen of the State of Florida, thereby making TRD a citizen of both Wyoming and Florida for purposes of diversity jurisdiction.

2.     At all material times hereto, Defendant ARK, is and has been a limited liability company organized under the laws of the state of Florida, with its principal place of business located at 24641 US Highway 19 North, Clearwater, FL 33763.

Upon information and belief, the members of Defendant ARK are also residents and citizens of the State of Florida.

3.     At all material times hereto, Defendant Reche Canyon, is and has been a limited liability company organized under the laws of the state of Florida, with its principal place of business located at 1350 Reche Canyon Road, Colton, CA 92324 (the "Reche Canyon Facility").   Upon information and belief, the members of Defendant Reche Canyon are residents and citizens of the State of Florida, thereby making Defendant Reche Canyon a citizen of both Florida and California for purposes of diversity jurisdiction.  Additionally, upon further information and belief, and at all material times hereto, Defendant Reche Canyon and the Reche Canyon Facility, have been actively managed, operated, and controlled by Defendant ARK.

4.     Upon information and belief, at all material times hereto, Defendant Reche Canyon has been the owner and operator of the Reche Canyon Facility, a skilled nursing facility (as such term is defined under the Medicaid Act), which furnishes nursing care to its residents, and, to those residents in need, certain therapy services not otherwise available directly from Defendant Reche Canyon or the Reche Canyon Facility.

5.     At all material times hereto, Defendant Birdmont, is and has been a limited liability company organized under the laws of the state of Virginia, with its principal place of business located at 990 Holston Rd., Wytheville, VA 24382 (the "Birdmont Facility").   Upon information and belief, the members of Defendant Birdmont are residents and citizens of the State of Florida, thereby making Defendant

Birdmont a citizen of both Florida and Virginia for purposes of diversity jurisdiction. Additionally, upon further information and belief, at all material times hereto, Defendant Birdmont and the Birdmont Facility have been actively managed, operated, and controlled by Defendant ARK.

6.      Upon information and belief, at all material times hereto, Defendant Birdmont has been the owner and operator of the Birdmont Facility, a skilled nursing facility (as such term is defined under the Medicaid Act), which furnishes nursing care to its residents, and, to those residents in need, certain therapy services not otherwise available directly from Defendant Birdmont or the Birdmont Facility.

7.      At all material times hereto, Defendant Trinity, is and has been a limited liability company organized under the laws of the state of Florida, with its principal place of business located at 2144 Welbilt Blvd., Trinity, FL 34655 (the "Trinity Facility").  Upon information and belief, the members of Defendant Trinity are also residents and citizens of the State of Florida.  Additionally, upon further information and belief, at all material times hereto, Defendant Trinity and the Trinity Facility have been actively managed, operated, and controlled by Defendant ARK.

8.      Upon information and belief, at all material times hereto, Defendant Trinity, has been the owner and operator of the Trinity Facility, a skilled nursing facility (as such term is defined under the Medicaid Act), which furnishes nursing care to its residents, and, to those residents in need, certain therapy services not otherwise available directly from Defendant Trinity or the Trinity Facility.

9.     At all material times hereto, Defendant Pines, is and has been a limited liability company organized under the laws of the state of Louisiana, with its principal place of business located at 14686 Old Hammond Highway, Baton Rouge, LA 70816 (the "Pines Facility").  Upon information and belief, the members of Defendant Pines are residents and citizens of the State of Florida, thereby making Defendant Pines a citizen of both Florida and Louisiana for purposes of diversity jurisdiction. Additionally, upon further information and belief, at all material times hereto, Defendant Pines and the Pines Facility have been actively managed, operated, and controlled by Defendant ARK.

10.     Upon information and belief, at all material times hereto, Defendant Pines, has been the owner and operator of the Pines Facility, a skilled nursing facility (as such term is defined under the Medicaid Act), which furnishes nursing care to its residents, and, to those residents in need, certain therapy services not otherwise available directly from Defendant Pines or the Pines Facility.

11.     At all material times hereto, Defendant St. Pete, is and has been a limited liability company organized under the laws of the state of Florida, with its principal place of business located at of 10501 Roosevelt Boulevard North, St. Petersburg, FL 33716 (the "St. Pete Facility").   Upon information and belief, the members of Defendant St. Pete are also residents and citizens of the State of Florida.  Additionally, upon further information and belief, at all material times hereto, Defendant St. Pete and the St. Pete Facility have been actively managed, operated, and controlled by Defendant ARK.

12.     Upon information and belief, at all material times hereto, Defendant St. Pete, has been the owner and operator of the St. Pete Facility, a skilled nursing facility (as such term is defined under the Medicaid Act), which furnishes nursing care to its residents, and, to those residents in need, certain therapy services not otherwise available directly from Defendant St. Pete or the St. Pete Facility.

13.     At all material times hereto, Defendant Tappahannock, is and has been a limited liability company organized under the laws of the state of Virginia, with its principal place of business located at 1150 Marsh Street, Tappahannock, VA 22560 (the "Tappahannock Facility").   Upon information and belief, the members of Defendant Tappahannock are residents and citizens of the State of Florida, thereby making Defendant Tappahannock a citizen of both Florida and Virginia for purposes of diversity jurisdiction.   Additionally, upon further information and belief, at all material times hereto, Defendant Tappahannock and the Tappahannock Facility have been actively managed, operated, and controlled by Defendant ARK.

14.     Upon information and belief, at all material times hereto, Defendant Tappahannock, has been the owner and operator of the Tappahannock Facility, a skilled nursing facility (as such term is defined under the Medicaid Act), which furnishes nursing care to its residents, and, to those residents in need, certain therapy services not otherwise available directly from Defendant Tappahannock or the Tappahannock Facility.

15.     At all material times hereto, Defendant Botetourt, is and has been a limited liability company organized under the laws of the state of Virginia, with its

principal place of business located at 290 Commons Parkway, Daleville, VA 24083 (the "Botetourt Facility"). Upon information and belief, the members of Defendant Botetourt are residents and citizens of the State of Florida, thereby making Defendant Botetourt a citizen of both Florida and Virginia for purposes of diversity jurisdiction. Additionally, upon further information and belief, at all material times hereto, Defendant Botetourt and the Botetourt Facility have been actively managed, operated, and controlled by Defendant ARK.

16.    Upon information and belief, at all material times hereto, Defendant Botetourt, has been the owner and operator of the Botetourt Facility, a skilled nursing facility (as such term is defined under the Medicaid Act), which furnishes nursing care to its residents, and, to those residents in need, certain therapy services not otherwise available directly from Defendant Botetourt or the Botetourt Facility.

17.    At all material times hereto, Defendant White Oak, is and has been a limited liability company organized under the laws of the state of Louisiana, with its principal place of business located at 2828 Westfork Drive Baton Rouge, LA 70816 (the "White Oak Facility"). Upon information and belief, the members of Defendant White Oak are residents and citizens of the State of Florida, thereby making Defendant White Oak a citizen of both Florida and Louisiana for purposes of diversity jurisdiction. Additionally, upon further information and belief, at all material times hereto, Defendant White Oak and the White Oak Facility have been managed, operated, and controlled by Defendant ARK.

18.     Upon information and belief, at all material times hereto, Defendant White Oak, has been the owner and operator of the White Oak Facility, a skilled nursing facility (as such term is defined under the Medicaid Act), which furnishes nursing care to its residents, and, to those residents in need, certain therapy services not otherwise available directly from Defendant White Oak or the White Oak Facility.

19.     At all material times hereto, Defendant Springhill, is and has been a limited liability company organized under the laws of the state of Louisiana, with its principal place of business located at 215 First Street, NE, Springhill, LA 71075 (the "Springhill Facility").   Upon information and belief, the members of Defendant Springhill are residents and citizens of the State of Florida, thereby making Defendant Springhill   a citizen of both Florida and Louisiana for purposes of diversity jurisdiction.   Additionally, upon further information and belief, at all material times hereto, Defendant Springhill and the Springhill Facility have been actively managed, operated, and controlled by Defendant ARK.

20.     Upon information and belief, at all material times hereto, Defendant Springhill, has been the owner and operator of the Springhill Facility, a skilled nursing facility (as such term is defined under the Medicaid Act), which furnishes nursing care to its residents, and, to those residents in need, certain therapy services not otherwise available directly from Defendant Springhill or the Springhill Facility.

21.     At all material times hereto, Defendant Greenbrier, is and has been a limited liability company organized under the laws of the state of Virginia, with its principal place of business located 1017 North George Washington Highway,

Chesapeake, VA 23323 (the "Greenbrier Facility").  Upon information and belief, the members of Defendant Greenbrier are residents and citizens of the State of Florida, thereby making Defendant Greenbrier a citizen of both Florida and Virginia for purposes of diversity jurisdiction.  Additionally, upon further information and belief, at all material times hereto, Defendant Greenbrier and the Greenbrier Facility have been actively managed, operated, and controlled by Defendant ARK.

22.    This Court has jurisdiction over this cause of action pursuant to 28 U.S.C. §1331 because this action arises under the laws of the United States, specifically with respect to 42 U.S.C. §§1983, 1395, 1396a and 1396u.  This Court also has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

23.    This Court has personal jurisdiction over each of the Defendants pursuant to Fla. Stat. § 48.193(1)(a), as each of the Defendants have operated, conducted, engaged in, and/or carried on a business or business venture in this state, have maintained an office or agency in this state, have committed a tortious act within this state and, with respect to certain Defendants herein, have breached a contract in this state.

24.    Venue is proper in this judicial district pursuant to 28 U.S.C. §1391 because a substantial portion of the events and omissions giving rise to the claims occurred within this District.

25.    Further, this court has jurisdiction and venue is proper because the administrative remedies made applicable under the Medicaid Act do not apply in this action, or in other words, there is no applicable administrative remedy under the Act

that applies to this particular type of dispute and amount in controversy. Accordingly, Plaintiff did not have any administrative remedies to exhaust and therefore judicial review is required and appropriate. 42 U.S.C. §405.

26.     Plaintiff has engaged the undersigned counsel and agreed to pay counsel its reasonable attorneys' fees for all services rendered in this action.

27.     All conditions precedent to the bringing of this action have been satisfied, excused or waived.

<u>**GENERAL ALLEGATIONS**</u>

<u>**THE MEDICARE ACT**</u>

28.     This is a civil action arising under the Medicaid Act, 42 U.S.C. § 1396, *et seq.* (the "Medicaid Act"), and 42 U.S.C. § 1983.

29.     Congress enacted the Medicare Program in 1965, as a federally operated health insurance program administered by the Secretary of Health and Human Services through the CMS, for the benefit of individuals 65 and older and the disabled. *See* 42 U.S.C. §1395c; *see also* 42 C.F.R. § 422.503(a).

30.     Parts A and B of the Medicare Program are commonly known as "traditional" Medicare.  Part A covers inpatient and institutional care, while Part B covers physician, hospital, outpatient, and ancillary services, speech and occupational therapy, and durable medical equipment.  *See,* e.g., 42 U.S.C. §§ 1395j to 1395w-5.

31.     Under Medicare Parts A and B, CMS reimburses healthcare providers (e.g., hospitals , physicians' offices, and skilled nursing facilities) directly using a fee-for-service system.  Specifically, healthcare providers submit claims to CMS for

medical services actually rendered, for which claims,[1] CMS, in turn, pays the providers directly for each service based on payment rates established by the Government. Moreover, §1902(a)(30)(A) of the Medicaid Act provides that "state Medicaid programs must ensure that provider payments are "consistent with efficiency, economy, and quality of care," and requires that payments to providers, such as Plaintiff here, be timely made consistent with or in the same matter as provided under 42 U.S.C. §§1396a(a)(37)(A) and 1396u-2(f) ("Prompt Payment Provision").

32.     The overriding purpose of the Prompt Payment Provision is to ensure that Medicaid beneficiaries do not pay for medical services rendered to them, and that should be paid instead by the CMS to the service provider.

33.     Just as the CMS has a Prompt Payment Provision, the healthcare facility, who outsources the services to a third-party service provider, likewise, has the same obligations under the Act to promptly pay the third-party service provider for the services rendered to its eligible Medicaid recipient.

34.     Specifically, 42 U.S.C. § 1396u-2(f) states in pertinent part:

**(f) Timeliness of Payment; Adequacy of Payment for Primary Care Services**

A contract under section 1396b(m) of this title with a Medicaid managed care organization shall provide that the organization shall make payment to health care providers for items and services which are subject to the contract and that are furnished to individuals eligible for medical assistance under the State plan under this subchapter who are enrolled with the organization on a timely basis

---

[1]Medicare Part B claims are submitted on form CMS 1500 or its electronic equivalent.

consistent with the claims payment procedures described in section 1396a(a)(13)(C) of this title, consistent with the minimum payment rates specified in such section (regardless of the manner in which such payments are made, including in the form of capitation or partial capitation).

## RELEVANT FACTUAL BACKGROUND

35.    TRD employs or otherwise engages licensed professionals (hereinafter, "Therapists"), who furnish, *inter alia,* speech-language pathology, physical and occupational therapy services (hereinafter, the "Rehabilitation Services") to, without limitation, licensed skilled nursing facilities, acute-care hospitals, and continuing care retirement facilities.

36.    The Facility Defendants collectively own and operate ten (10) different skilled nursing facilities (collectively, the "SNFs")[2], located throughout Florida, California, Louisiana and Virginia.

37.    As a result of TRD's well regarded status and reputation in the healthcare community, in or around 2015, TRD began entering into various therapy services agreements with each of the respective Defendants to provide Rehabilitation Services to the patients of the respective SNFs.

38.    Specifically, the payment for services provided under the agreements with the respective SNFs required compliance with the Medicaid Act to promptly

---

[2]As used herein, the term "SNFs" shall collectively refer to respective Defendant "Facilities," as described herein.

identify and submit the requisite information for reimbursement purposes, and to promptly remit payment to Plaintiff for the direct services provided.

39.    The SNFs have failed to fulfill its statutory duties to remit payment to the direct service provider under Section 1396u-2(f), and has converted the funds for its own use, further defrauding the government as it has failed to remit payment of the reimbursement funds received.

### *Reche Canyon TSA and the  Reche Canyon Facility*

40.    On or about November 1, 2015, Defendant Reche Canyon entered into that certain therapy services agreement with TRD (as amended, modified and extended, the "Reche Canyon TSA"), pursuant to which, Defendant Reche Canyon, as the owner and operator of the Reche Canyon Facility, agreed, in relevant part, to retain the services of TRD to provide residents of the Reche Canyon Facility including, without limitation, those residents receiving benefits under Part B of Medicare, with Rehabilitation Services pursuant to the terms of the Reche Canyon TSA and which were subject to reimbursement from Medicare.  A true and correct copy of the Reche Canyon TSA is attached hereto and incorporated herein as **Exhibit "A"**.

41.    Pursuant to the terms of the Reche Canyon TSA, Defendant Reche Canyon as the owner and operator of Reche Canyon Facility, was obligated to: (i) maintain complete and timely clinical records for each resident provided Rehabilitation Services by TRD including, without limitation, patient diagnosis, medical history, progress notes relating to Rehabilitation Services received, minimum data set ("MDS") classification system assessments and resource utilization groups

("RUGs") IV classifications, relating to the provision of Rehabilitation Services; (ii) all billing and collections relating to the Rehabilitation Servies provided by TRD, including seeking reimbursement from Medicare and other third-party payors, as applicable, for Rehabilitation Services furnished by TRD to residents of the Reche Canyon Facility; (iii) upon receipt of any and all invoices provided by TRD for Rehabilitation Services rendered to residents of the Reche Canyon Facility, to submit same to the CMS for reimbursement, and (iv) make payment to TRD for such services pursuant to the terms and conditions of the Reche Canyon TSA, without regard to Defendant Reche Canyon or the Reche Canyon Facility's ability to collect such amounts from patients, residents, insurers, or Medicare.  Pursuant to Section 3 of the Reche Canyon TSA, in the event that Defendant Reche Canyon, as the owner and operator of the Reche Canyon Facility, failed to make payment in accordance with of the Reche Canyon TSA following receipt of any invoice of services rendered by TRD, all such outstanding amounts would accrue interest at the rate of two percent (2%) per annum until paid in full.  *See* Ex. A at ¶¶ 2.1, 2.3, 3, 6.1, and 6.2.

42.    As a condition of the Reche Canyon TSA, Plaintiff, as part of its obligations thereunder, was required to provide services to the Reche Canyon Facility's patients in accordance with the terms of the Reche Canyon TSA, the requirements of federal and state law(s), and pursuant to the terms of participation and reimbursement coverage imposed by any applicable government and/or third-party payor(s) including, without limitation, Medicaid.

43.     Section 4.7 of the Reche Canyon TSA further provides, in pertinent part, that in the event of the Reche Canyon TSA is terminated for any reason whatsoever, such termination "**shall not affect or negate**" the obligation of Defendant Reche Canyon or the Reche Canyon Facility to pay the fees to TRD accrued prior to "**the effective date of termination.**" (Emphasis supplied).

44.     Thereafter, by written correspondence dated on or about March 28, 2023 and sent by Defendant ARK on behalf of Defendant Reche Canyon and the Reche Canyon Facility, Defendants purported to terminate the Reche Canyon TSA on behalf of Defendant Reche Canyon and the Reche Canyon Facility without cause pursuant to Section 4.2(a) therein (the "Termination Notice"), effective as of 11:59 p.m. on April 30, 2023 (the "Termination Date"), and immediately triggering the payment obligations owed thereunder by Defendant Reche Canyon and the Reche Canyon Facility due to TRD.  A true and correct copy of the Termination Notice is attached hereto and incorporated herein as **Exhibit "B."**

45.     Accordingly, in accordance with its obligations under the terms of the Reche Canyon TSA, on or about April 30, 2023, and in satisfaction of its condition precedent to payment under the Reche Canyon TSA, TRD invoiced Defendant Reche Canyon for Rehabilitation Services (Invoice No. 1428) rendered to residents of the Reche Canyon Facility in the total amount of $152,753.73.

46.     Pursuant to the plain and unambiguous terms of the Reche Canyon TSA, payment of Plaintiff's final invoice for Rehabilitation Services rendered to residents of

the Reche Canyon Facility through and including April 30, 2023, was due on or before

June 15, 2023 [45 days after receipt of same following the Termination Date].

47.     All of the Rehabilitation Services provided by TRD to Defendant Reche

Canyon and to patients of the Reche Canyon Facility including, but not limited to,

those Rehabilitation Services expressly described under Invoice No. 1428, were at all

times material hereto, subject to reimbursement from Medicare, Medicaid and/or

other private third-party payors and, upon further information and belief, Defendants

ARK and/or Reche Canyon, did in fact submit for and receive reimbursement from

Medicaid for all or a significant portion of those Rehabilitation Services provided by

TRD, as further detailed by Invoice No. 1428, to the residents of the Reche Canyon

Facility, and have directly or indirectly benefited from such reimbursement,  yet have

nevertheless failed and refused to remit such amounts or otherwise compensate TRD

for its services provided to the residents of the Reche Canyon Facility, in direct

violation of the terms of the Reche Canyon TSA, and which improper retention and

diversion of funds is also contrary to the reimbursement standards and practices under

the Medicaid Act.

48.     On or about July 7, 2023, TRD, by and through the undersigned counsel,

sent written demand to Defendants, Reche Canyon, ARK, and the Reche Canyon

Facility, demanding payment for Rehabilitation Services rendered to the residents of

the Reche Canyon Facility including, but not limited to, those services described by

Invoice No. 1428 (the "Reche Canyon Demand").  A true and correct copy of the

Reche Canyon Demand is attached hereto and incorporated herein as **Exhibit "C."**

20

49.     To date, despite repeated demands to Defendants, Reche Canyon, ARK, and the Reche Canyon Facility, including the Reche Canyon Demand, in breach of the terms of the Reche Canyon TSA, and in violation of the Prompt Payment Provisions, particularly Section 1396u-2(f) of the Act, Defendants have failed and refused to pay for the Rehabilitation Services provided by TRD including, without limitation, those services further described by Invoice No. 1428, and for which outstanding amounts, totaling an amount of no less than  $152,753.73, which sum continues to accrue interest pursuant to the terms of the Reche Canyon TSA.

### *Birdmont TSA and the Birdmont Facility*

50.     On or about October 1, 2015, Defendant Birdmont entered into that certain therapy services agreement with TRD,  (as amended, modified and extended, the "Birdmont TSA") pursuant to which, Defendant Birdmont, as the owner and operator of the Birdmont Facility, agreed, in relevant part, to retain the services of TRD to provide residents of the Birdmont Facility including, without limitation, those residents receiving benefits under Part B of Medicare, with Rehabilitation Services pursuant to the terms of the Birdmont TSA and which were subject to reimbursement from Medicare.  A true and correct copy of the Birdmont TSA is attached hereto and incorporated herein as **Exhibit "D"**.

51.     Pursuant to the terms of the Birdmont TSA, Defendant Birdmont as the owner and operator of Birdmont Facility, was obligated to: (i) maintain complete and timely clinical records for each resident provided Rehabilitation Services by TRD including, without limitation, patient diagnosis, medical history, progress notes

relating to Rehabilitation Services received, minimum data set ("MDS") classification system assessments and resource utilization groups ("RUGs") IV classifications, relating to the provision of Rehabilitation Services; (ii) all billing and collections relating to the Rehabilitation Servies provided by TRD, including seeking reimbursement from Medicare and other third-party payors, as applicable, for Rehabilitation Services furnished by TRD to residents of the Birdmont Facility; (iii) upon receipt of any and all invoices provided by TRD for Rehabilitation Services rendered to residents of the Birdmont Facility, to submit same to the CMS for reimbursement, and (iv)  to make payment to TRD for such services pursuant to the terms and conditions of the Birdmont TSA, without regard to Defendant Birdmont or the Birdmont Facility's ability to collect such amounts from patients, residents, insurers, or Medicare.  Pursuant to Section 3 of the Birdmont TSA, in the event that Defendant Birdmont, as the owner and operator of the Birdmont Facility, failed to make payment in accordance with of the Birdmont TSA following receipt of any invoice of services rendered by TRD, all such outstanding amounts would accrue interest at the rate of two percent (2%) per annum until paid in full.  *See* Ex. D at ¶¶ 2.1, 2.3, 3, 6.1, and 6.2.

52.    As a condition of the Birdmont TSA, Plaintiff, as part of its obligations thereunder, was required to provide services to the Birdmont Facility's patients in accordance with the terms of the Birdmont TSA, the requirements of federal and state law(s), and pursuant to the terms of participation and reimbursement coverage

imposed by any applicable government and/or third-party payor(s) including, without limitation, Medicaid.

53.     Section 4.7 of the Birdmont TSA further provides, in pertinent part, that in the event of the Birdmont TSA is terminated for any reason whatsoever, such termination "**shall not affect or negate**" the obligation of Defendant Birdmont or the Birdmont Facility to pay the fees to TRD accrued prior to "**the effective date of termination.**" (Emphasis supplied).  *See* Ex. D.

54.     Thereafter, on or about March 28, 2023, Defendant ARK, on behalf of Defendant Birdmont and the Birdmont Facility, sent the Termination Notice to TRD which purports to terminate the Birdmont TSA, without cause pursuant to Section 4.2(a) therein, as of the Termination Date.  Pursuant to the plain and unambiguous language of the Birdmont TSA, the Termination Notice immediately triggered the payment obligations owed thereunder by Defendant Birdmont and the Birdmont Facility due to TRD.  *See* Ex. B.

55.     Accordingly, in accordance with its obligations under the terms of the Birdmont TSA, TRD invoiced Defendant Birdmont and the Birdmont Facility for Rehabilitation Services  furnished to residents of the Birdmont Facility as follows: (i) on March 31, 2023 (Invoice No. 1424) for $90,867.01; and (ii) on April 30, 2023 (Invoice No. 1434) for $72,504.23, in the total amount of $163,371.24.

56.     Pursuant to the plain and unambiguous terms of the Birdmont TSA, payment of Plaintiff's final invoices for Rehabilitation Services rendered to residents of the Birdmont Facility through and including April 30, 2023, was due on or before

May 31, 2023 [30 days after receipt of same following the Termination Date].  *See* Ex. D.

57.     All of the Rehabilitation Services provided by TRD to Defendant Birdmont and to patients of the Birdmont Facility including, but not limited to, those Rehabilitation Services expressly described under Invoice No.'s 1424 and 1434, were at all times material hereto, subject to reimbursement from Medicare, Medicaid and/or other private third-party payors and, upon further information and belief, Defendants ARK and/or Birdmont, did in fact submit for and receive reimbursement from Medicaid for all or a significant portion of those Rehabilitation Services provided by TRD, as further detailed by Invoice No.'s 1424 and 1434, to the residents of the Birdmont Facility, and have directly or indirectly benefited from such reimbursement, yet have nevertheless failed and refused to remit such amounts or otherwise compensate TRD for its services provided to the residents of the Birdmont Facility, in direct violation of the terms of the Birdmont TSA, and which improper retention and diversion of funds is also contrary to the reimbursement standards and practices under the Medicaid Act.

58.     On or about July 7, 2023, TRD, by and through the undersigned counsel, sent written demand to Defendants, Birdmont, ARK, and the Birdmont Facility, demanding payment for Rehabilitation Services rendered to the residents of the Birdmont Facility including, but not limited to, those services described by Invoice No.'s 1424 and 1434 (the "Birdmont Demand").  A true and correct copy of the Birdmont Demand is attached hereto and incorporated herein as **Exhibit "E."**

59.     To date, despite repeated demands to Defendants, Birdmont, ARK, and the Birdmont Facility, including the Birdmont Demand, in breach of the terms of the Birdmont TSA, and in violation of the Prompt Payment Provisions, particularly Section 1396u-2(f), of the Act, Defendants have failed and refused to pay for the Rehabilitation Services provided by TRD including, without limitation, those services further described by Invoice No.'s 1424 and 1434, for which outstanding sums in an amount of no less than $163,371.24, continues to accrue interest pursuant to the terms of the Birdmont TSA.

### *Trinity TSA and the Trinity Facility*

60.     On or about October 1, 2020, Defendant Trinity entered into that certain therapy services agreement with TRD (as amended, modified and extended, the "Trinity TSA"), pursuant to which, Defendant Trinity, as the owner and operator of the Trinity Facility, agreed, in relevant part, to retain the services of TRD to provide residents of the Trinity Facility including, without limitation, those residents receiving benefits under Part B of Medicare, with Rehabilitation Services pursuant to the terms of the Trinity TSA and which were subject to reimbursement from Medicare.  A true and correct copy of the Trinity TSA is attached hereto and incorporated herein as **Exhibit "F**.

61.     Pursuant to the terms of the Trinity TSA, Defendant Trinity as the owner and operator of Trinity Facility, was obligated to: (i) maintain complete and timely clinical records for each resident provided Rehabilitation Services by TRD including, without limitation, patient diagnosis, medical history, progress notes relating to

Rehabilitation Services received, minimum data set ("MDS") classification system assessments and resource utilization groups ("RUGs") IV classifications, relating to the provision of Rehabilitation Services; (ii) all billing and collections relating to the Rehabilitation Servies provided by TRD, including seeking reimbursement from Medicare and other third-party payors, as applicable, for Rehabilitation Services furnished by TRD to residents of the Trinity Facility; (iii) upon receipt of any and all invoices provided by TRD for Rehabilitation Services rendered to residents of the Trinity Facility, submit same to CMS for reimbursement, and (iv) to make payment to TRD for such services pursuant to the terms and conditions of the Trinity TSA, without regard to Defendant Trinity or the Trinity Facility's ability to collect such amounts from patients, residents, insurers, or Medicare.  Pursuant to Section 3 of the Trinity TSA, in the event that Defendant Trinity, as the owner and operator of the Trinity Facility, failed to make payment in accordance with of the Trinity TSA following receipt of any invoice of services rendered by TRD, all such outstanding amounts would accrue interest at the rate of two percent (2%) per annum until paid in full.  *See* Ex. F at ¶¶ 2.1, 2.3, 3, 6.1, and 6.2.

62.     As a condition of the Trinty TSA, Plaintiff, as part of its obligations thereunder, was required to provide services to the Trinity Facility's patients in accordance with the terms of the Trinity TSA, the requirements of federal and state law(s), and pursuant to the terms of participation and reimbursement coverage imposed by any applicable government and/or third-party payor(s) including, without limitation, Medicaid.

63.     Section 4.7 of the Trinity TSA further provides, in pertinent part, that in the event of the Trinity TSA is terminated for any reason whatsoever, such termination "**shall not affect or negate"** the obligation of Defendant Trinity or the Trinity Facility to pay the fees to TRD accrued prior to "**the effective date of termination."** (Emphasis supplied).  *See* Ex. F.

64.     Thereafter, on or about March 28, 2023, Defendant ARK, on behalf of Defendant Trinity and the Trinity Facility, sent the Termination Notice to TRD which purports to terminate the Trinity TSA, without cause pursuant to Section 4.2(a) therein, as of the Termination Date.  Pursuant to the plain and unambiguous language of the Trinity TSA, the Termination Notice immediately triggered the payment obligations owed thereunder by Defendant Trinity and the Trinity Facility due to TRD.  *See* Ex. B.

65.     Accordingly,   on or about April 30, 2023, in accordance with its obligations under the terms of the Trinity TSA, TRD invoiced Defendant Trinity and the Trinity Facility for Rehabilitation Services (Invoice No. 1432) furnished to residents of the Trinity Facility in the total amount of $110,184.63.

66.     Pursuant to the plain and unambiguous terms of the Trinity TSA, payment of Plaintiff's final invoices for Rehabilitation Services rendered to residents of the Trinity Facility through and including April 30, 2023, was due on or before May 31, 2023 [30 days after receipt of same following the Termination Date].  *See* Ex. F.

67.     All of the Rehabilitation Services provided by TRD to Defendant Trinty and to patients of the Trinity Facility including, but not limited to, those Rehabilitation

Services expressly described under Invoice No. 1432, were at all times material hereto, subject to reimbursement from Medicare, Medicaid and/or other private third-party payors and, upon further information and belief, Defendants ARK and/or Trinity did in fact submit for and receive reimbursement from Medicaid for all or a significant portion of those Rehabilitation Services provided by TRD, as further detailed by Invoice No. 1432, to the residents of the Trinity Facility, and have directly or indirectly benefited from such reimbursement, yet have nevertheless failed and refused to remit such amounts or otherwise compensate TRD for its services provided to the residents of the Trinity Facility, in direct violation of the terms of the Trinity TSA, and which improper retention and diversion of funds is also contrary to the reimbursement standards and practices under the Medicaid Act.

68.     On or about July 7, 2023, TRD, by and through the undersigned counsel, sent written demand to Defendants, Trinity ARK, and the Trinity Facility, demanding payment for Rehabilitation Services rendered to the residents of the Trinity Facility including, but not limited to, those services described by Invoice No. 1432 (the "Trinity Demand").  A true and correct copy of the Trinity Demand is attached hereto and incorporated herein as **Exhibit "G."**

69.     To date, despite repeated demands to Defendants, Trinity, ARK, and the Trinity Facility, including the Trinity Demand, in breach of the terms of the Trinity TSA, and in violation of the Prompt Payment Provisions, particularly Section 1396u-2(f), of the Act, Defendants have failed and refused to pay for the Rehabilitation Services provided by TRD including, without limitation, those services further

described by Invoice No. 1432, for which outstanding sums, in an amount of no less than $110,184.63, continues to accrue interest pursuant to the terms of the Trinity TSA.

### *Pines TSA and the Pines Facility*

70.     On or about January 1, 2021, Defendant Pines entered into that certain therapy services agreement with TRD (as amended, modified and extended, the "Pines TSA"), pursuant to which, Defendant Pines as the owner and operator of the Pines Facility, agreed, in relevant part, to retain the services of TRD to provide residents of the Pines Facility including, without limitation, those residents receiving benefits under Part B of Medicare, with Rehabilitation Services pursuant to the terms of the Pines TSA and which were subject to reimbursement from Medicare.  A true and correct copy of the Pines TSA is attached hereto and incorporated herein as **Exhibit "H**."

71.     Pursuant to the terms of the Pines TSA, Defendant Pines as the owner and operator of Pines Facility, was obligated to: (i) maintain complete and timely clinical records for each resident provided Rehabilitation Services by TRD including, without limitation, patient diagnosis, medical history, progress notes relating to Rehabilitation Services received, minimum data set ("MDS") classification system assessments and resource utilization groups ("RUGs") IV classifications, relating to the provision of Rehabilitation Services; (ii) all billing and collections relating to the Rehabilitation Servies provided by TRD, including seeking reimbursement from Medicare and other third-party payors, as applicable, for Rehabilitation Services

furnished by TRD to residents of the Pines Facility; (iii) upon receipt of any and all invoices provided by TRD for Rehabilitation Services rendered to residents of the Pines Facility, submit same to CMS for reimbursement, and (iv) to make payment to TRD for such services pursuant to the terms and conditions of the Pines TSA, without regard to Defendant Pines or the Pines Facility's ability to collect such amounts from patients, residents, insurers, or Medicare.  Pursuant to Section 3 of the Pines TSA, in the event that Defendant Pines, as the owner and operator of the Pines Facility, failed to make payment in accordance with the Pines TSA following receipt of any invoice of services rendered by TRD, all such outstanding amounts would accrue interest at the rate of two percent (2%) per annum until paid in full.  *See* Ex. H at ¶¶ 2.1, 2.3, 3, 6.1, and 6.2.

72.    As a condition of the Pines TSA, Plaintiff, as part of its obligations thereunder, was required to provide services to the Pines Facility's patients in accordance with the terms of the Pines TSA, the requirements of federal and state law(s), and pursuant to the terms of participation and reimbursement coverage imposed by any applicable government and/or third-party payor(s) including, without limitation, Medicaid.

73.    Section 4.7 of the Pines TSA further provides, in pertinent part, that in the event of the Pines TSA is terminated for any reason whatsoever, such termination "**shall not affect or negate**" the obligation of Defendant Pines or the Pines Facility to pay the fees to TRD accrued prior to "**the effective date of termination.**" (Emphasis supplied).  *See* Ex. H.

30

74. Thereafter, on or about March 28, 2023, Defendant ARK, on behalf of Defendant Pines  and the Pines Facility, sent the Termination Notice to TRD which purports to terminate the Pines TSA, without cause pursuant to Section 4.2(a) therein, as of the Termination Date.  Pursuant to the plain and unambiguous language of the Pines TSA, the Termination Notice immediately triggered the payment obligations owed thereunder by Defendant Pines and the Pines Trinity due to TRD.  *See* Ex. B.

75. Accordingly, on or about April 30, 2023, in accordance with its obligations under the terms of the Pines TSA, TRD invoiced Defendant Pines and the Pines Facility for Rehabilitation Services (Invoice No. 1427) furnished to residents of the Pines Facility in the total amount of $36,703.09.

76. Pursuant to the plain and unambiguous terms of the Pines TSA, payment of Plaintiff's final invoices for Rehabilitation Services rendered to residents of the Trinity Facility through and including April 30, 2023, was due on or before May 31, 2023 [30 days after receipt of same following the Termination Date].  *See* Ex. H.

77. All of the Rehabilitation Services provided by TRD to Defendant Pines and to patients of the Pines Facility including, but not limited to, those Rehabilitation Services expressly described under Invoice No. 1427, were at all times material hereto, subject to reimbursement from Medicare, Medicaid and/or other private third-party payors and, upon further information and belief, Defendants ARK and/or Pines did in fact submit for and receive reimbursement from Medicaid for all or a significant portion of those Rehabilitation Services provided by TRD, as further detailed by Invoice No. 1427 to the residents of the Pines Facility, and have directly or indirectly

benefited from such reimbursement, yet have nevertheless failed and refused to remit such amounts or otherwise compensate TRD for its services provided to the residents of the Pines Facility, in direct violation of the terms of the Pines TSA, and which improper retention and diversion of funds is also contrary to the reimbursement standards and practices under the Medicaid Act.

78.     On or about July 7, 2023, TRD, by and through the undersigned counsel, sent written demand to Defendants, Trinity Pines, and the Pines Facility, demanding payment for Rehabilitation Services rendered to the residents of the Pines Facility including, but not limited to, those services described by Invoice No. 1427 (the "Pines Demand").  A true and correct copy of the Pines Demand is attached hereto and incorporated herein as **Exhibit "I."**

79.     To date, despite repeated demands to Defendants, Pines, ARK, and the Pines Facility, including the Pines Demand, in breach of the terms of the Pines TSA, and in violation of the Prompt Payment Provisions, particularly Section 1396u-2(f), of the Act, Defendants have failed and refused to pay for the Rehabilitation Services provided by TRD including, without limitation, those services further described by Invoice No. 1427, for which outstanding sums, in an amount of no less than $36,703.09, continues to accrue interest pursuant to the terms of the Pines TSA.

### *The St. Pete TSA and St. Pete Facility*

80.     On or about April 1, 2020, Defendant St. Pete entered into that certain therapy services agreement with TRD (as amended, modified and extended, the "St. Pete TSA"), pursuant to which, Defendant St. Pete, as the owner and operator of the

St. Pete Facility, agreed, in relevant part, to retain the services of TRD to provide residents of the St. Pete Facility including, without limitation, those residents receiving benefits under Part B of Medicare, with Rehabilitation Services pursuant to the terms of the St. Pete TSA and which were subject to reimbursement from Medicare.  A true and correct copy of the St. Pete TSA is attached hereto and incorporated herein as **Exhibit "J**."

81.    Pursuant to the terms of the St. Pete TSA, Defendant St. Pete, as the owner and operator of St. Pete Facility, was obligated to: (i) maintain complete and timely clinical records for each resident provided Rehabilitation Services by TRD including, without limitation, patient diagnosis, medical history, progress notes relating to Rehabilitation Services received, minimum data set ("MDS") classification system assessments and resource utilization groups ("RUGs") IV classifications, relating to the provision of Rehabilitation Services; (ii) all billing and collections relating to the Rehabilitation Servies provided by TRD, including seeking reimbursement from Medicare and other third-party payors, as applicable, for Rehabilitation Services furnished by TRD to residents of the St. Pete Facility; and (iii) upon receipt of any and all invoices provided by TRD for Rehabilitation Services rendered to residents of the St. Pete Facility, to submit same to CMS for reimbursement, and (iv) to make payment to TRD for such services pursuant to the terms and conditions of the St. Pete TSA, without regard to Defendant St. Pete or the St. Pete Facility's ability to collect such amounts from patients, residents, insurers, or Medicare.  Pursuant to Section 3 of the St. Pete TSA, in the event that Defendant St.

Pete, as the owner and operator of the St. Pete Facility, failed to make payment in accordance with the St. Pete TSA following receipt of any invoice of services rendered by TRD, all such outstanding amounts would accrue interest at the rate of two percent (2%) per annum until paid in full.  *See* Ex. J at ¶¶ 2.1, 2.3, 3, 6.1, and 6.2.

82.    As a condition of the St. Pete TSA, Plaintiff, as part of its obligations thereunder, was required to provide services to the St. Pete Facility's patients in accordance with the terms of the St. Pete TSA, the requirements of federal and state law(s), and pursuant to the terms of participation and reimbursement coverage imposed by any applicable government and/or third-party payor(s) including, without limitation, Medicaid.

83.    Section 4.7 of the St. Pete TSA further provides, in pertinent part, that in the event of the St. Pete TSA is terminated for any reason whatsoever, such termination "**shall not affect or negate"** the obligation of Defendant St. Pete or the St. Pete Facility to pay the fees to TRD accrued prior to "**the effective date of termination."** (Emphasis supplied).  *See* Ex. J.

84.    Thereafter, on or about March 28, 2023, Defendant ARK, on behalf of Defendant St. Pete and the St. Pete Facility, sent the Termination Notice to TRD which purports to terminate the St. Pete TSA, without cause pursuant to Section 4.2(a) therein, as of the Termination Date.  Pursuant to the plain and unambiguous language of the St. Pete TSA, the Termination Notice immediately triggered the payment

obligations owed thereunder by Defendant St. Pete and the St. Pete Facility due to TRD.  *See* Ex. B.

85.    Accordingly, in accordance with its obligations under the terms of the St. Pete TSA, TRD invoiced Defendant St. Pete and the St. Pete Facility for Rehabilitation Services furnished to residents of the St. Pete Facility as follows: (i) on February 28, 2023 (Invoice No. 1410) for $70,452.43; (ii) on March 31, 2023 (Invoice No. 1420) for $92,562.10; and (iii) on April 30, 2023 (Invoice No. 1430) for $79,831.26, in the total amount of $242,845.79.

86.    Pursuant to the plain and unambiguous terms of the St. Pete TSA, payment of Plaintiff's final invoices for Rehabilitation Services rendered to residents of the St. Pete Facility through and including April 30, 2023, was due on or before May 31, 2023 [30 days after receipt of same following the Termination Date].  *See* Ex. J.

87.    All of the Rehabilitation Services provided by TRD to Defendant St. Pete and to patients of the St. Pete Facility including, but not limited to, those Rehabilitation Services expressly described under Invoice No.'s 1410, 1420, and 1430, were at all times material hereto, subject to reimbursement from Medicare, Medicaid and/or other private third-party payors and, upon further information and belief, Defendants ARK and/or St. Pete, did in fact submit for and receive reimbursement from Medicaid for all or a significant portion of those Rehabilitation Services provided by TRD, as further detailed by Invoice No.'s 1410, 1420, and 1430, to the residents of the St. Pete Facility, and have directly or indirectly benefited from such

reimbursement, yet have nevertheless failed and refused to remit such amounts or otherwise compensate TRD for its services provided to the residents of the St. Pete Facility, in direct violation of the terms of the St. Pete TSA, and which improper retention and diversion of funds is also contrary to the reimbursement standards and practices under the Medicaid Act.

88.    On or about July 7, 2023, TRD, by and through the undersigned counsel, sent written demand to Defendants, St. Pete, ARK, and the St. Pete Facility, demanding payment for Rehabilitation Services rendered to the residents of the St. Pete Facility including, but not limited to, those services described by Invoice No.'s 1410, 1420, and 1430 (the "St. Pete Demand").  A true and correct copy of the St. Pete Demand is attached hereto and incorporated herein as **Exhibit "K."**

89.    To date, despite repeated demands to Defendants, St. Pete, ARK, and the St. Pete Facility, including the St. Pete Demand, in breach of the terms of the St. Pete TSA, and in violation of the Prompt Payment Provisions, particularly Section 1396u-2(f), and other applicable provisions of the Act, Defendants have failed and refused to pay for the Rehabilitation Services provided by TRD including, without limitation, those services further described by Invoice No.'s 1410, 1420, and 1430, for which outstanding sums in an amount of no less than $242,845.79, continues to accrue interest pursuant to the terms of the St. Pete TSA.

### *The Tappahannock TSA and the Tappahannock Facility*

90.    On or about April 1, 2020, Defendant Tappahannock entered into that certain therapy services agreement with TRD (as amended, modified and extended,

36

the "Tappahannock TSA"), pursuant to which, Defendant Tappahannock, as the owner and operator of the Tappahannock Facility, agreed, in relevant part, to retain the services of TRD to provide residents of the Tappahannock Facility including, without limitation, those residents receiving benefits under Part B of Medicare, with Rehabilitation Services pursuant to the terms of the Tappahannock TSA and which were subject to reimbursement from Medicare.   A true and correct copy of the Tappahannock is attached hereto and incorporated herein as **Exhibit "L**."

91.   Pursuant to the terms of the Tappahannock TSA, Defendant Tappahannock, as the owner and operator of Tappahannock Facility, was obligated to: (i) maintain complete and timely clinical records for each resident provided Rehabilitation Services by TRD including, without limitation, patient diagnosis, medical history, progress notes relating to Rehabilitation Services received, minimum data set ("MDS") classification system assessments and resource utilization groups ("RUGs") IV classifications, relating to the provision of Rehabilitation Services; (ii) all billing and collections relating to the Rehabilitation Servies provided by TRD, including seeking reimbursement from Medicare and other third-party payors, as applicable, for Rehabilitation Services furnished by TRD to residents of the Tappahannock Facility; (iii) upon receipt of any and all invoices provided by TRD for Rehabilitation Services rendered to residents of the Tappahannock Facility, submit same to CMS for reimbursement, and (iv) to make payment to TRD for such services pursuant to the terms and conditions of the Tappahannock TSA, without regard to Defendant Tappahannock or the Tappahannock Facility's ability to collect such

amounts from patients, residents, insurers, or Medicare.  Pursuant to Section 3 of the Tappahannock TSA, in the event that Defendant Tappahannock, as the owner and operator of the Tappahannock Facility, failed to make payment in accordance with of the Tappahannock TSA following receipt of any invoice of services rendered by TRD, all such outstanding amounts would accrue interest at the rate of two percent (2%) per annum until paid in full.  *See* Ex. L at ¶¶ 2.1, 2.3, 3, 6.1, and 6.2.

92.     As a condition of the Tappahannock TSA, Plaintiff, as part of its obligations thereunder, was required to provide services to the Tappahannock Facility's patients in accordance with the terms of the Tappahannock TSA, the requirements of federal and state law(s), and pursuant to the terms of participation and reimbursement coverage imposed by any applicable government and/or third-party payor(s) including, without limitation, Medicaid.

93.     Section 4.7 of the Tappahannock TSA further provides, in pertinent part, that in the event of the Tappahannock TSA is terminated for any reason whatsoever, such termination "**shall not affect or negate**" the obligation of Defendant Tappahannock or the Tappahannock Facility to pay the fees to TRD accrued prior to "**the effective date of termination.**" (Emphasis supplied).  *See* Ex. L.

94.     Thereafter, on or about March 28, 2023, Defendant ARK, on behalf of Defendant Tappahannock and the Tappahannock Facility, sent the Termination Notice to TRD which purports to terminate the Tappahannock TSA, without cause pursuant to Section 4.2(a) therein, as of the Termination Date.  Pursuant to the plain and unambiguous language of the Tappahannock TSA, the Termination Notice

immediately triggered the payment obligations owed thereunder by Defendant Tappahannock and the Tappahannock Trinity due to TRD.  *See* Ex. B.

95.    Accordingly, on or about April 30, 2023, in accordance with its obligations under the terms of the Tappahannock TSA, TRD invoiced (Invoice No. 1431) Defendant Tappahannock and the Tappahannock Facility for Rehabilitation Services furnished to residents of the Tappahannock Facility in the total amount of $38,376.42.

96.    Pursuant to the plain and unambiguous terms of the Tappahannock TSA, payment of Plaintiff's final invoices for Rehabilitation Services rendered to residents of the Tappahannock Facility through and including April 30, 2023, was due on or before June 15, 2023 [45 days after receipt of same following the Termination Date]. *See* Ex. L.

97.    All of the Rehabilitation Services provided by TRD to Defendant Tappahannock and to patients of the Tappahannock Facility including, but not limited to, those Rehabilitation Services expressly described under Invoice No. 1431, were at all times material hereto, subject to reimbursement from Medicare, Medicaid and/or other private third-party payors and, upon further information and belief, Defendants ARK and/or Tappahannock, did in fact submit for and receive reimbursement from Medicaid for all or a significant portion of those Rehabilitation Services provided by TRD, as further detailed by Invoice No. 1431, to the residents of the Tappahannock Facility, and have directly or indirectly benefited from such reimbursement, yet have nevertheless failed and refused to remit such amounts or otherwise compensate TRD

for its services provided to the residents of the Tappahannock Facility, in direct violation of the terms of the Tappahannock TSA, and which improper retention and diversion of funds is also contrary to the reimbursement standards and practices under the Medicaid Act.

98.     On or about July 7, 2023, TRD, by and through the undersigned counsel, sent written demand to Defendants, Tappahannock, ARK, and the Tappahannock Facility, demanding payment for Rehabilitation Services rendered to the residents of the Tappahannock Facility including, but not limited to, those services described by Invoice No. 1431 (the "Tappahannock Demand").  A true and correct copy of the Tappahannock Demand is attached hereto and incorporated herein as **Exhibit "M."**

99.     To date, despite repeated demands to Defendants, Tappahannock, ARK, and the Tappahannock Facility, including the Tappahannock, Demand, in breach of the terms of the Tappahannock TSA, and in violation of the Prompt Payment Provisions, particularly Section 1396u-2(f), and other applicable provisions of the Act, Defendants have failed and refused to pay for the Rehabilitation Services provided by TRD including, without limitation, those services further described by Invoice No. 1431, for which outstanding sums in an amount of no less than $38,376.42, continues to accrue interest pursuant to the terms of the Tappahannock TSA.

100.    Moreover, Tappahannock, ARK, and the Tappahannock Facility, at all times material hereto, were aware that TRD, in reliance on Defendants' representations regarding its performance under the terms of the Tappahannock TSA, entered into various agreements with certain 3rd party providers including, but not

limited to, Centra Healthcare Solutions and CoreMedical Group, to assist TRD with performing its obligations under the Tappahannock TSA to the Defendants and in providing services to the residents of the Tappahannock Facility.

101.   Yet, despite such knowledge regarding TRD's 3rd party contracts, and TRD's reliance on Defendants' representations regarding its performance under the terms of the Tappahannock TSA in entering into such agreements, Defendants have nevertheless breached such obligations owed to TRD, and unjustifiably caused TRD to be unable to perform and default on its obligations owed to said 3rd party providers.

### *The Botetourt TSA and the Botetourt Facility*

102.   On or about October 1, 2015, Defendant Botetourt entered into that certain therapy services agreement with TRD (as amended, modified and extended, the "Botetourt TSA"), pursuant to which, Defendant Botetourt, as the owner and operator of the Botetourt Facility, agreed, in relevant part, to retain the services of TRD to provide residents of the Botetourt Facility including, without limitation, those residents receiving benefits under Part B of Medicare, with Rehabilitation Services pursuant to the terms of the Botetourt TSA and which were subject to reimbursement from Medicare.  A true and correct copy of the Botetourt TSA is attached hereto and incorporated herein as **Exhibit "N**."

103.   Pursuant to the terms of the Botetourt TSA, Defendant Botetourt, as the owner and operator of Botetourt Facility, was obligated to: (i) maintain complete and timely clinical records for each resident provided Rehabilitation Services by TRD including, without limitation, patient diagnosis, medical history, progress notes


relating to Rehabilitation Services received, minimum data set ("MDS") classification system assessments and resource utilization groups ("RUGs") IV classifications, relating to the provision of Rehabilitation Services; (ii) all billing and collections relating to the Rehabilitation Servies provided by TRD, including seeking reimbursement from Medicare and other third-party payors, as applicable, for Rehabilitation Services furnished by TRD to residents of the Botetourt Facility; (iii) upon receipt of any and all invoices provided by TRD for Rehabilitation Services rendered to residents of the Botetourt Facility, to submit same to CMS for reimbursement, and (iv) to make payment to TRD for such services pursuant to the terms and conditions of the Botetourt TSA, without regard to Defendant Botetourt or the Botetourt Facility's ability to collect such amounts from patients, residents, insurers, or Medicare.  Pursuant to Section 3 of the Botetourt TSA, in the event that Defendant Botetourt, as the owner and operator of the Botetourt Facility, failed to make payment in accordance with of the Botetourt TSA following receipt of any invoice of services rendered by TRD, all such outstanding amounts would accrue interest at the rate of two percent (2%) per annum until paid in full.  *See* Ex. N at ¶¶ 2.1, 2.3, 3, 6.1, and 6.2.

104.   As a condition of the Botetourt TSA, Plaintiff, as part of its obligations thereunder, was required to provide services to the Botetourt Facility's patients in accordance with the terms of the Botetourt TSA, the requirements of federal and state law(s), and pursuant to the terms of participation and reimbursement coverage

imposed by any applicable government and/or third-party payor(s) including, without limitation, Medicaid.

105.    Section 4.7 of the Botetourt TSA further provides, in pertinent part, that in the event of the Botetourt TSA is terminated for any reason whatsoever, such termination "**shall not affect or negate**" the obligation of Defendant Botetourt or the Botetourt to pay the fees to TRD accrued prior to "**the effective date of termination.**" (Emphasis supplied).  *See* Ex. N.

106.    Thereafter, on or about March 28, 2023, Defendant ARK, on behalf of Defendant Botetourt and the Botetourt Facility, sent the Termination Notice to TRD which purports to terminate the Botetourt TSA, without cause pursuant to Section 4.2(a) therein, as of the Termination Date.  Pursuant to the plain and unambiguous language of the Botetourt TSA, the Termination Notice immediately triggered the payment obligations owed thereunder by Defendant Botetourt and the Botetourt Facility due to TRD.  *See* Ex. B.

107.    Accordingly, on or about April 30, 2023, in accordance with its obligations under the terms of the Botetourt TSA, TRD invoiced (Invoice No. 1425) Defendant Botetourt and the Botetourt Facility for Rehabilitation Services furnished to residents of the Botetourt Facility in the total amount of $44,750.72.

108.    Pursuant to the plain and unambiguous terms of the Botetourt TSA, payment of Plaintiff's final invoices for Rehabilitation Services rendered to residents of the Botetourt Facility through and including April 30, 2023, was due on or before

June 15, 2023 [45 days after receipt of same following the Termination Date].  *See* Ex. N.

109.   All of the Rehabilitation Services provided by TRD to Defendant Botetourt and to patients of the Botetourt Facility including, but not limited to, those Rehabilitation Services expressly described under Invoice No. 1425, were at all times material hereto, subject to reimbursement from Medicare, Medicaid and/or other private third-party payors and, upon further information and belief, Defendants ARK and/or Botetourt, did in fact submit for and receive reimbursement from Medicaid for all or a significant portion of those Rehabilitation Services provided by TRD, as further detailed by Invoice No. 1425, to the residents of the Botetourt Facility, and have directly or indirectly benefited from such reimbursement, yet have nevertheless failed and refused to remit such amounts or otherwise compensate TRD for its services provided to the residents of the Botetourt Facility, in direct violation of the terms of the Botetourt TSA, and which improper retention and diversion of funds is also contrary to the reimbursement standards and practices under the Medicaid Act.

110.   On or about July 7, 2023, TRD, by and through the undersigned counsel, sent written demand to Defendants, Botetourt, ARK, and the Botetourt Facility, demanding payment for Rehabilitation Services rendered to the residents of the Botetourt Facility including, but not limited to, those services described by Invoice No. 1425 (the "Botetourt Demand").  A true and correct copy of the Botetourt Demand is attached hereto and incorporated herein as **Exhibit "O."**

111.   To date, despite repeated demands to Defendants, Botetourt, ARK, and the Botetourt Facility, including the Botetourt, Demand, in breach of the terms of the Botetourt TSA, and in violation of the Prompt Payment Provisions, particularly Section 1396u-2(f), and other applicable provisions of the Act, Defendants have failed and refused to pay for the Rehabilitation Services provided by TRD including, without limitation, those services further described by Invoice No. 1425, for which outstanding sums, in an amount of no less than $44,966.50, continues to accrue interest pursuant to the terms of the Botetourt TSA.

112.   Moreover, Botetourt, ARK, and the Botetourt Facility, at all times material hereto, were aware that TRD, in reliance on Defendants' representations regarding its performance under the terms of the Botetourt TSA, entered into various agreements with certain 3rd party providers including, but not limited to, Jackson Therapy Partners, LLC and Fusion Medical Staffing, LLC, to assist TRD with performing its obligations under the Botetourt TSA to the Defendants and in providing services to the residents of the Botetourt Facility.

113.   Yet, despite such knowledge regarding TRD's 3rd party contracts, and TRD's reliance on Defendants' representations regarding its performance under the terms of the Botetourt TSA in entering into such agreements, Defendants have nevertheless breached such obligations owed to TRD, and unjustifiably caused TRD to be unable to perform and default on its obligations owed to said 3rd party providers.

### *The White Oak TSA and the White Oak Facility*

114.   On or about January 1, 2021, Defendant White Oak entered into that certain therapy services agreement with TRD (as amended, modified and extended, the "White Oak TSA"), pursuant to which, Defendant White Oak, as the owner and operator of the White Oak Facility, agreed, in relevant part, to retain the services of TRD to provide residents of the White Oak Facility including, without limitation, those residents receiving benefits under Part B of Medicare, with Rehabilitation Services pursuant to the terms of the White Oak TSA and which were subject to reimbursement from Medicare.   A true and correct copy of the White Oak TSA is attached hereto and incorporated herein as **Exhibit "P**."

115.   Pursuant to the terms of the White Oak TSA, Defendant White Oak, as the owner and operator of White Oak Facility, was obligated to: (i) maintain complete and timely clinical records for each resident provided Rehabilitation Services by TRD including, without limitation, patient diagnosis, medical history, progress notes relating to Rehabilitation Services received, minimum data set ("MDS") classification system assessments and resource utilization groups ("RUGs") IV classifications, relating to the provision of Rehabilitation Services; (ii) all billing and collections relating to the Rehabilitation Servies provided by TRD, including seeking reimbursement from Medicare and other third-party payors, as applicable, for Rehabilitation Services furnished by TRD to residents of the White Oak Facility; (iii) upon receipt of any and all invoices provided by TRD for Rehabilitation Services rendered to residents of the White Oak Facility, to submit same to CMS for

reimbursement, and (iv) to make payment to TRD for such services pursuant to the terms and conditions of the White Oak TSA, without regard to Defendant White Oak or the White Oak Facility's ability to collect such amounts from patients, residents, insurers, or Medicare.  Pursuant to Section 3 of the White Oak TSA, in the event that Defendant White Oak, as the owner and operator of the White Oak Facility, failed to make payment in accordance with of the White Oak TSA following receipt of any invoice of services rendered by TRD, all such outstanding amounts would accrue interest at the rate of two percent (2%) per annum until paid in full.  *See* Ex. P at ¶¶ 2.1, 2.3, 3, 6.1, and 6.2.

116.   As a condition of the White Oak TSA, Plaintiff, as part of its obligations thereunder, was required to provide services to the White Oak Facility's patients in accordance with the terms of the White Oak TSA, the requirements of federal and state law(s), and pursuant to the terms of participation and reimbursement coverage imposed by any applicable government and/or third-party payor(s) including, without limitation, Medicaid.

117.   Section 4.7 of the White Oak TSA further provides, in pertinent part, that in the event of the White Oak TSA is terminated for any reason whatsoever, such termination "**shall not affect or negate**" the obligation of Defendant White Oak or the White Oak Facility to pay the fees to TRD accrued prior to "**the effective date of termination.**" (Emphasis supplied).  *See* Ex. P.

118.   Thereafter, on or about March 28, 2023, Defendant ARK, on behalf of Defendant White Oak and the White Oak Facility, sent the Termination Notice to

TRD which purports to terminate the White Oak TSA, without cause pursuant to Section 4.2(a) therein, as of the Termination Date.   Pursuant to the plain and unambiguous language of the White Oak TSA, the Termination Notice immediately triggered the payment obligations owed thereunder by Defendant White Oak and the White Oak Facility due to TRD.  *See* Ex. B.

119.   Accordingly, in accordance with its obligations under the terms of the White Oak TSA, TRD invoiced Defendant White Oak and the White Oak Facility for Rehabilitation Services furnished to residents of the White Oak Facility as follows: (i) on March 31, 2023 (Invoice No. 1423) for $57,813.20; and (ii) on April 30, 2023 (Invoice No. 1433) for $46,830.44, in the total amount of $104,643.64.

120.   Pursuant to the plain and unambiguous terms of the White Oak TSA, payment of Plaintiff's final invoices for Rehabilitation Services rendered to residents of the White Oak Facility through and including April 30, 2023, was due on or before May 31, 2023 [30 days after receipt of same following the Termination Date].  *See* Ex. P.

121.   All of the Rehabilitation Services provided by TRD to Defendant White Oak and to patients of the White Oak Facility including, but not limited to, those Rehabilitation Services expressly described under Invoice No.'s 1423 and 1433, were at all times material hereto, subject to reimbursement from Medicare, Medicaid and/or other private third-party payors and, upon further information and belief, Defendants ARK and/or White Oak, did in fact submit for and receive reimbursement from Medicaid for all or a significant portion of those Rehabilitation Services provided

by TRD, as further detailed by Invoice No.'s 1423 and 1433, to the residents of the White Oak Facility, and have directly or indirectly benefited from such reimbursement, yet have nevertheless failed and refused to remit such amounts or otherwise compensate TRD for its services provided to the residents of the White Oak Facility, in direct violation of the terms of the White Oak TSA, and which improper retention and diversion of funds is also contrary to the reimbursement standards and practices under the Medicaid Act.

122.   On or about July 7, 2023, TRD, by and through the undersigned counsel, sent written demand to Defendants, White Oak, ARK, and the White Oak Facility, demanding payment for Rehabilitation Services rendered to the residents of the White Oak Facility including, but not limited to, those services described by Invoice No.'s 1423 and 1433 (the "White Oak Demand").  A true and correct copy of the White Oak Demand is attached hereto and incorporated herein as **Exhibit "Q."**

123.   To date, despite repeated demands to Defendants, White Oak, ARK, and the White Oak Facility, including the White Oak Demand, in breach of the terms of the White Oak TSA, and in violation of the Prompt Payment Provisions, particularly Section 1396u-2(f), and other applicable provisions of the Act, Defendants have failed and refused to pay for the Rehabilitation Services provided by TRD including, without limitation, those services further described by Invoice No.'s 1423 and 1433, for which outstanding sums in an amount of no less than $104,643.64, continues to accrue interest pursuant to the terms of the White Oak TSA.

49

### *The Springhill TSA and the Springhill Facility*

124.   On or about March 1, 2021, Defendant Springhill entered into that certain therapy services agreement with TRD (as amended, modified and extended, the "Springhill TSA"), pursuant to which, Defendant Springhill as the owner and operator of the Springhill Facility, agreed, in relevant part, to retain the services of TRD to provide residents of the Springhill Facility including, without limitation, those residents receiving benefits under Part B of Medicare, with Rehabilitation Services pursuant to the terms of the Springhill TSA and which were subject to reimbursement from Medicare.   A true and correct copy of the Springhill TSA is attached hereto and incorporated herein as **Exhibit "R**."

125.   Pursuant to the terms of the Springhill TSA, Defendant Springhill, as the owner and operator of Springhill Facility, was obligated to: (i) maintain complete and timely clinical records for each resident provided Rehabilitation Services by TRD including, without limitation, patient diagnosis, medical history, progress notes relating to Rehabilitation Services received, minimum data set ("MDS") classification system assessments and resource utilization groups ("RUGs") IV classifications, relating to the provision of Rehabilitation Services; (ii) all billing and collections relating to the Rehabilitation Servies provided by TRD, including seeking reimbursement from Medicare and other third-party payors, as applicable, for Rehabilitation Services furnished by TRD to residents of the Springhill Facility; (iii) upon receipt of any and all invoices provided by TRD for Rehabilitation Services rendered to residents of the Springhill Facility, to submit same to CMS for

50

reimbursement, and (iv) to make payment to TRD for such services pursuant to the terms and conditions of the Springhill TSA, without regard to Defendant Springhill or the Springhill Facility's ability to collect such amounts from patients, residents, insurers, or Medicare.  Pursuant to Section 3 of the Springhill TSA, in the event that Defendant Springhill as the owner and operator of the Springhill Facility, failed to make payment in accordance with of the Springhill TSA following receipt of any invoice of services rendered by TRD, all such outstanding amounts would accrue interest at the rate of two percent (2%) per annum until paid in full.  *See* Ex. R at ¶¶ 2.1, 2.3, 3, 6.1, and 6.2.

126.   As a condition of the Springhill TSA, Plaintiff, as part of its obligations thereunder, was required to provide services to the Springhill Facility's patients in accordance with the terms of the Springhill TSA, the requirements of federal and state law(s), and pursuant to the terms of participation and reimbursement coverage imposed by any applicable government and/or third-party payor(s) including, without limitation, Medicaid.

127.   Section 4.7 of the Springhill TSA further provides, in pertinent part, that in the event of the Springhill TSA is terminated for any reason whatsoever, such termination "**shall not affect or negate**" the obligation of Defendant Springhill or the Springhill Facility to pay the fees to TRD accrued prior to "**the effective date of termination.**" (Emphasis supplied).  *See* Ex. R.

128.   Thereafter, on or about March 28, 2023, Defendant ARK, on behalf of Defendant Springhill and the Springhill Facility, sent the Termination Notice to TRD

which purports to terminate the Springhill TSA, without cause pursuant to Section 4.2(a) therein, as of the Termination Date.  Pursuant to the plain and unambiguous language of the Springhill TSA, the Termination Notice immediately triggered the payment obligations owed thereunder by Defendant Springhill and the Springhill Facility due to TRD.  *See* Ex. B.

129.   Accordingly, on or about March 31, 2023, in accordance with its obligations under the terms of the Springhill TSA, TRD invoiced Defendant Springhill and the Springhill Facility (Invoice No. 1419) for Rehabilitation Services furnished to residents of the Springhill Facility in the total amount of $41,752.37.

130.   Pursuant to the plain and unambiguous terms of the Springhill TSA, payment of all invoices submitted by Plaintiff for Rehabilitation Services rendered to residents of the Springhill Facility pursuant to the terms of the Springhill TSA, were due within 30 days of receipt of such invoice from TRD [or by April 30, 2023].  *See* Ex. R.

131.   However, notwithstanding the foregoing obligations, Defendant Springhill, ARK, and/or the Springhill Facility, failed to make payment to TRD for Rehabilitation Services furnished to residents of the Springhill Facility in the total amount of $41,752.37, on or before April 30, 2023, or anytime thereafter.

132.   All of the Rehabilitation Services provided by TRD to Defendant Springhill and to patients of the Springhill Facility including, but not limited to, those Rehabilitation Services expressly described under Invoice No. 1419, were at all times material hereto, subject to reimbursement from Medicare, Medicaid and/or other

52

private third-party payors and, upon further information and belief, Defendants ARK and/or Springhill, did in fact submit for and receive reimbursement from Medicaid for all or a significant portion of those Rehabilitation Services provided by TRD, as further detailed by Invoice No. 1419, to the residents of the Springhill Facility, and have directly or indirectly benefited from such reimbursement, yet have nevertheless failed and refused to remit such amounts or otherwise compensate TRD for its services provided to the residents of the Springhill Facility, in direct violation of the terms of the Springhill TSA, and which improper retention and diversion of funds is also contrary to the reimbursement standards and practices under the Medicaid Act.

133.    On or about July 7, 2023, TRD, by and through the undersigned counsel, sent written demand to Defendants, Springhill, ARK, and the Springhill Facility, demanding payment for Rehabilitation Services rendered to the residents of the Springhill Facility including, but not limited to, those services described by Invoice No. 1419 (the "Springhill Demand").  A true and correct copy of the Springhill Demand is attached hereto and incorporated herein as **Exhibit "S."**

134.    To date, despite repeated demands to Defendants, Springhill, ARK, and the Springhill Facility, including the Springhill Demand, in breach of the terms of the Springhill TSA, and in violation of the Prompt Payment Provisions, particularly Section 1396u-2(f), and other applicable provisions of the Act, Defendants have failed and refused to pay for the Rehabilitation Services provided by TRD including, without limitation, those services further described by Invoice No. 1419, for which outstanding

sums in an amount of no less than $41,752.37, continues to accrue interest pursuant to the terms of the Springhill TSA.

### *The Greenbrier TSA and the Greenbrier Facility*

135.   On or about April 1, 2018, Defendant Greenbrier entered into that certain therapy services agreement with TRD (as amended, modified and extended, the "Greenbrier TSA"), pursuant to which, Defendant Greenbrier as the owner and operator of the Greenbrier Facility, agreed, in relevant part, to retain the services of TRD to provide residents of the Greenbrier Facility including, without limitation, those residents receiving benefits under Part B of Medicare, with Rehabilitation Services pursuant to the terms of the Greenbrier TSA and which were subject to reimbursement from Medicare.  A true and correct copy of the Greenbrier TSA is attached hereto and incorporated herein as **Exhibit "T**."

136.   Pursuant to the terms of the Greenbrier TSA, Defendant Greenbrier, as the owner and operator of Greenbrier Facility, was obligated to: (i) maintain complete and timely clinical records for each resident provided Rehabilitation Services by TRD including, without limitation, patient diagnosis, medical history, progress notes relating to Rehabilitation Services received, minimum data set ("MDS") classification system assessments and resource utilization groups ("RUGs") IV classifications, relating to the provision of Rehabilitation Services; (ii) all billing and collections relating to the Rehabilitation Servies provided by TRD, including seeking reimbursement from Medicare and other third-party payors, as applicable, for Rehabilitation Services furnished by TRD to residents of the Greenbrier Facility; (iii)

upon receipt of any and all invoices provided by TRD for Rehabilitation Services rendered to residents of the St. Pete Facility, to submit same to CMS for reimbursement, and (iv) to make payment to TRD for such services pursuant to the terms and conditions of the Greenbrier TSA, without regard to Defendant Greenbrier or the Greenbrier Facility's ability to collect such amounts from patients, residents, insurers, or Medicare.  Pursuant to Section 3 of the Greenbrier TSA, in the event that Defendant Greenbrier, as the owner and operator of the Greenbrier Facility, failed to make payment in accordance with of the Greenbrier TSA following receipt of any invoice of services rendered by TRD, all such outstanding amounts would accrue interest at the rate of two percent (2%) per annum until paid in full.  *See* Ex. T at ¶¶ 2.1, 2.3, 3, 6.1, and 6.2.

137.   As a condition of the Greenbrier TSA, Plaintiff, as part of its obligations thereunder, was required to provide services to the Greenbrier Facility's patients in accordance with the terms of the Greenbrier TSA, the requirements of federal and state law(s), and pursuant to the terms of participation and reimbursement coverage imposed by any applicable government and/or third-party payor(s) including, without limitation, Medicaid.

138.   Section 4.7 of the Greenbrier TSA further provides, in pertinent part, that in the event of the Greenbrier TSA is terminated for any reason whatsoever, such termination "**shall not affect or negate"** the obligation of Defendant Greenbrier or the Greenbrier Facility to pay the fees to TRD accrued prior to "**the effective date of termination."**  (Emphasis supplied).  *See* Ex. T.

139.   Thereafter, on or about March 28, 2023, Defendant ARK, on behalf of Defendant Greenbrier and the Greenbrier Facility, sent the Termination Notice to TRD which purports to terminate the Greenbrier TSA, without cause pursuant to Section 4.2(a) therein, as of the Termination Date.   Pursuant to the plain and unambiguous language of the Greenbrier TSA, the Termination Notice immediately triggered the payment obligations owed thereunder by Defendant Greenbrier and the Greenbrier Facility due to TRD.  *See* Ex. B.

140.   Accordingly, on or about April 30, 2023, in accordance with its obligations under the terms of the Greenbrier TSA, TRD invoiced (Invoice No. 1426) Defendant Greenbrier and the Greenbrier Facility for Rehabilitation Services furnished to residents of the Greenbrier Facility in the total amount of $31,319.13.

141.   Pursuant to the plain and unambiguous terms of the Greenbrier TSA, payment of Plaintiff's final invoices for Rehabilitation Services rendered to residents of the Greenbrier Facility through and including April 30, 2023, was due on or before May 31, 2023 [30 days after receipt of same following the Termination Date].  *See* Ex. T.

142.   All of the Rehabilitation Services provided by TRD to Defendant Greenbrier and to patients of the Greenbrier Facility including, but not limited to, those Rehabilitation Services expressly described under Invoice No. 1426, were at all times material hereto, subject to reimbursement from Medicare, Medicaid and/or other private third-party payors and, upon further information and belief, Defendants ARK and/or Greenbrier, did in fact submit for and receive reimbursement from

Medicaid for all or a significant portion of those Rehabilitation Services provided by TRD, as further detailed by Invoice No. 1426, to the residents of the Greenbrier Facility, and have directly or indirectly benefited from such reimbursement, yet have nevertheless failed and refused to remit such amounts or otherwise compensate TRD for its services provided to the residents of the Greenbrier Facility, in direct violation of the terms of the Greenbrier TSA, and which improper retention and diversion of funds is also contrary to the reimbursement standards and practices under the Medicaid Act.

143.   On or about July 7, 2023, TRD, by and through the undersigned counsel, sent written demand to Defendants, Greenbrier ARK, and the Greenbrier Facility, demanding payment for Rehabilitation Services rendered to the residents of the Greenbrier Facility including, but not limited to, those services described by Invoice No. 1426 (the "Greenbrier Demand").   A true and correct copy of the Greenbrier Demand is attached hereto and incorporated herein as **Exhibit "U."**

144.   To date, despite repeated demands to Defendants, Greenbrier ARK, and the Greenbrier Facility, including the Greenbrier Demand, in breach of the terms of the Greenbrier TSA, and in violation of the Prompt Payment Provisions, particularly Section 1396u-2(f), and other applicable provisions of the Act, Defendants have failed and refused to pay for the Rehabilitation Services provided by TRD including, without limitation, those services further described by Invoice No. 1426, for which outstanding sums in an amount of no less than $31,319.13, continues to accrue interest pursuant to the terms of the Greenbrier TSA.

**Defendants' Unilateral Modification of the Medicaid Act Payment Provisions**

145.    Ark on behalf of the NSF Defendants notified Plaintiff that the they had failed to remit payment to Plaintiff for (i) Invoice No. 1428 pertaining to the Reche Canyon TSA, (ii) Invoice No. 1424 and 1434 pertaining to Birdmont TSA, (iii) Invoice No. 1432 pertaining to Trinity TSA, (iv) Invoice No. 1427 pertaining to Pines TSA, (v) Invoice No. 1410, 1420, and 1430 pertaining to the St. Pete TSA, (vi) Invoice No. 1431 pertaining to the Tappahannock TSA, (vii) Invoice no. 1425 pertaining to the Botetourt TSA, (viii) Invoice Nos. 1423 and 1433 pertaining to the White Oak TSA, (ix) Invoice No. 1419 pertaining to the Springhill TSA, and (x) Invoice No. 1426 pertaining to the Greenbrier TSA (collectively, the "Outstanding Invoice").

146.    Specifically, Defendants advised that they are under no obligation or duty to remit payment to Plaintiff as it pertains to the Outstanding Invoices and the Medicaid Act because Defendants allege that Plaintiff received Federal PPP loans throughout the COVID-19 Pandemic.

147.    Defendants assert that they are not required to remit payment to Plaintiff for the services provided considering the PPP loans received by Plaintiff, which Defendant claims would cover the reimbursement for services rendered in lieu of Medicaid reimbursement payments.

148.    Defendants are single-handedly attempting to modify the terms of the Act, to which they have no right or authority to do so. Further, the Act fails to identify

58

how a government grant, unrelated to the eligible Medicaid services provided, is compensation/reimbursement for services provided under the Medicaid Act.

149. Notwithstanding Defendants position that Plaintiff has already been paid through Federal PPP loans, Defendants nevertheless proceeded to submit reimbursement request for services provided as it relates to the Outstanding Invoices.

150. Thus, if Defendants claim that the Outstanding Invoices have been covered through the PPP loans then they have falsely submitted reimbursement requests to the CMS and have wrongfully converted either (i) governments funds, or (ii) the Plaintiff's reimbursement, for their own benefit.

## COUNT I – PRIVATE CAUSE OF ACTION UNDER 42 U.S.C. § 1396u-2(f), (RECHE CANYON, BIRDMONT, TRINITY, PINES, ST. PETE, TAPPAHANNOCK, BOTETOURT, WHITE OAK, SPRINGHILL AND GREENBRIER)

151. Plaintiff re-alleges and re-incorporates the allegations contained in paragraphs 1 through 150, as if fully set forth herein.

152. Plaintiff asserts a private cause of action pursuant to 42 U.S.C. § 1396-u(2)(f) against the Facility Defendants, Reche Canyon, Birdmont, Trinity, Pines, St. Pete, Tappahannock, Botetourt, White Oak, and Greenbrier.

153. Plaintiff maintained a contract with each of the Facility Defendants, namely, the Reche Canyon TSA, Birdmont TSA, Trinity TSA, Pines TSA, St. Pete TSA, Tappahannock TSA, Botetourt TSA, White Oak TSA and the Greenbrier TSA (collectively the "Agreements") to provide services to its respective patients who are

covered under the Medicaid Act and to receive payment through reimbursement received by CMS under the Medicaid Act.

154.   A contract under Section 1396b(m) with a Medicaid managed care organization shall provide that the organization, i.e., the Facility Defendants, shall make payment to the healthcare providers, i.e. Plaintiff, for items and services which are subject to the contract and that are furnished to individuals eligible for medical assistance under the State plan under this Act who are enrolled with the organization on a timely basis, consistent with the claims payment procedure described in section 1396a(a)(37)(A). See, 42 U.S.C. § 1396u-2(f)

155.   The Facility Defendants have failed to remit payment to Plaintiff for the Outstanding Invoices consistent with the respective Agreements entered into with the Facility Defendants and the prompt payment provisions of the Medicaid Act.

156.   Accordingly, Plaintiff has been damaged in the amount of the Outstanding Invoices and are being directly deprived of a right in violation of 42 U.S.C. § 1983.

157.   Plaintiff is not required to exhaust any administrative remedies for this action, as no such administrative remedies exist for a dispute of this nature, and for the quantity in dispute.

**WHEREFORE**, Plaintiff, TRD, respectfully requests that this Court enter judgment for damages against the Facility Defendants, including actual damages, consequential damages, costs, pre and post-judgment interest, and such other relief as this Court deems just and proper.

**COUNT II - DECLARATORY RELIEF – DEFENDANTS MUST REMIT
PAYMENT CONSISTENT WITH THE MEDICAID ACT
(RECHE CANYON, BIRDMONT, TRINITY, PINES, ST. PETE,
TAPPAHANNOCK, BOTETOURT, WHITE OAK, SPRINGHILL AND
GREENBRIER)**

158.    Plaintiff re-alleges and re-incorporates the allegations contained in paragraphs 1 through 150, as if fully set forth herein.

159.    Plaintiff asserts a cause of action for declaratory relief pursuant to the federal Declaratory Judgment Act, confirming the Facility Defendants obligations to promptly remit payment to Plaintiff for services rendered under the parties' respective Agreements.

160.    There is a bona fide, actual, present and practical need for the declaration.

161.    Indeed, there exists an actual and justified controversy between Plaintiff and the Facility Defendants as it pertains to the reimbursement/payment for services rendered as it relates to the Outstanding Invoices and respective Agreements.

162.    Plaintiff maintained a contract with each of the Facility Defendants, namely, the Reche Canyon TSA, Birdmont TSA, Trinity TSA, Pines TSA, St. Pete TSA, Tappahannock TSA, Botetourt TSA, White Oak TSA and the Greenbrier TSA (collectively the "Agreements") to provide services to its respective patients who are covered under the Medicaid Act and to receive payment through reimbursement received by CMS under the Medicaid Act.

163.    A contract under Section 1396b(m) with a Medicaid managed care organization shall provide that the organization, i.e., the Facility Defendants, shall

make payment to the healthcare providers, i.e. Plaintiff, for items and services which are subject to the contract and that are furnished to individuals eligible for medical assistance under the State plan under this Act who are enrolled with the organization on a <u>timely basis</u>, consistent with the claims payment procedure described in section 1396a(a)(37)(A). See, 42 U.S.C. § 1396u-2(f)

164.   The Facility Defendants have failed to remit payment to Plaintiff for the Outstanding Invoices consistent with the respective Agreements entered into with the Facility Defendants and the prompt payment provisions of the Medicaid Act.

165.   Defendants claim that they are not required to remit payment under the Act for the services rendered to their patients that are covered under the Act.

166.   Plaintiff timely and properly submitted the Outstanding Invoices and all other pertinent information and documentation for the Facility Defendants to obtain the reimbursement from the CMS.

167.   The Facility Defendants submitted the claims and Outstanding Invoices for reimbursement, received the payment from the CMS, yet have failed to and/or are refusing to remit the reimbursement to Plaintiff in direct violation of the Medicaid Act.

168.   At no point did the parties agree to an alternative form of payment for the services provided as it pertains to the Outstanding Invoices.

169.   Notwithstanding, the Facility Defendants have refused to make payment claiming that Plaintiff received Federal PPP loans which covered the reimbursement payment pertaining to the Outstanding Invoices.

170.   Whether Plaintiffs are owed the reimbursement payment from the Facility Defendants consistent with the parties' Agreements, Outstanding Invoices, and Medicaid Act depends on the surrounding agreements, Acts, circumstances, and intent of the services provided and pursuant to a contract under Section 1396b(m).

171.   Further, a controversy has arisen between the Facility Defendants and Plaintiff as it pertains to the form of payment for the services provided.

172.   Accordingly, Plaintiff has been damaged in the amount of the Outstanding Invoices and are being directly deprived of a their right in violation of 42 U.S.C. § 1983.

173.   Plaintiff's right to receive payment under the Medicaid Act is dependent on this declaration.

174.   Plaintiff is not required to exhaust any administrative remedies for this action, as no such administrative remedies exist for a dispute of this nature, and for the quantity in dispute.

175.   Plaintiff asserts that he is entitled to payment for services rendered to the Facility Defendants patients consistent with 42 U.S.C. § 1396u-2(f) .

176.   Indeed, Plaintiff has a clear right to the relief sought in light of the Act, services rendered, and the parties' Agreements.

177.   Plaintiff has no other adequate remedy at law.

178.   The Facility Defendants have a clearly defined and peremptory duty to do the act in question.

179.    Accordingly, Plaintiff is in doubt as to his rights and required a declaration from the Court to resolve the dispute between the parties.

**WHEREFORE**, Plaintiff, TRD, respectfully requests that this Court enter judgment for against the Facility Defendants declaring that the said Defendants have to remit payment to Plaintiff consistent with the Medicaid Act as it pertains to the Outstanding Invoices, provided that Defendants have sought and received reimbursement from the CMS, and therefore, must remit payment to Plaintiff as directed by 42 U.S.C. § 1396u-2(f), and such other relief as this Court deems just and proper.

## COUNT III – DECLARATORY RELIEF – FEDERAL PPP LOANS ARE NOT MEDICAID PAYMENTS FOR SERVICES PROVIDED UNDER THE ACT (RECHE CANYON, BIRDMONT, TRINITY, PINES, ST. PETE, TAPPAHANNOCK, BOTETOURT, WHITE OAK, SPRINGHILL AND GREENBRIER)

180.    Plaintiff re-alleges and re-incorporates the allegations contained in paragraphs 1 through 150, as if fully set forth herein.

181.    Plaintiff asserts a cause of action for declaratory relief pursuant to the federal Declaratory Judgment Act, confirming whether or not Federal PPP Loans received throughout the Covid-19 Pandemic is a reimbursement payment in lieu of CMS making a reimbursement for eligible services provided under the Medicaid Act, which Facility Defendants refuse to pay to Plaintiff.

182.    There is a bona fide, actual, present and practical need for the declaration.

183.   Indeed, there exists an actual and justified controversy between Plaintiff and the Facility Defendants as it pertains to the reimbursement/payment for services rendered as it relates to the Outstanding Invoices and respective Agreements.

184.   Plaintiff maintained a contract with each of the Facility Defendants, namely, the Reche Canyon TSA, Birdmont TSA, Trinity TSA, Pines TSA, St. Pete TSA, Tappahannock TSA, Botetourt TSA, White Oak TSA and the Greenbrier TSA (collectively the "Agreements") to provide services to its respective patients who are covered under the Medicaid Act and to receive payment through reimbursement received by CMS under the Medicaid Act.

185.   A contract under Section 1396b(m) with a Medicaid managed care organization shall provide that the organization, i.e., the Facility Defendants, shall make payment to the healthcare providers, i.e. Plaintiff, for items and services which are subject to the contract and that are furnished to individuals eligible for medical assistance under the State plan under this Act who are enrolled with the organization on a <u>timely basis</u>, consistent with the claims payment procedure described in section 1396a(a)(37)(A). See, 42 U.S.C. § 1396u-2(f)

186.   The Facility Defendants have failed to remit payment to Plaintiff for the Outstanding Invoices consistent with the prompt payment provisions of the Medicaid Act.

187.   Defendants claim that they are not required to remit payment under the Act for the services rendered to its patients that are covered under the Act, particularly

because, Plaintiff received a governmental grant, i.e., Federal PPP Loans for Covid-19 relief.

188.    Notably, Covid-19 relief funds are not reimbursement payments pursuant to the Medicaid Act for services provided.

189.    Whether the Facility Defendants have the discretion to deprive Plaintiff from reimbursement payments and unilaterally modify the provisions and terms of the Act for payment of services rendered, is a question of federal law.

190.    However, the Act does not provide a SNF with discretion to modify payment terms or to deviate from the timely payment requirements of the provision, 42 U.S.C. § 1396u-2(f).

191.    Any failure to fully and promptly pay regardless of the reason, is a violation of the Social Security Act and it's respective Medicaid Act.

192.    Indeed, Plaintiff timely and properly submitted the Outstanding Invoices and all other pertinent information and documentation for the Facility Defendants to obtain the reimbursement from the CMS.

193.    The Facility Defendants submitted the claims and Outstanding Invoices for reimbursement, received the payment from the CMS, yet have failed to and/or are refusing to remit the reimbursement to Plaintiff in direct violation of the Medicaid Act and for their own benefit or budgetary reasons.

194.    There is no provision, express or implied, in the Act permitting a SNF to alter federal standards to suit its budgetary needs. While participation is voluntary, it must strictly adhere to the requirements and obligations of the Medicaid Act.

195.   Notwithstanding, the Facility Defendants have refused to make payment claiming that Plaintiff received Federal PPP loans which were received in lieu of the Medicaid reimbursement payments pertaining to the Outstanding Invoices.

196.   Whether Plaintiffs are owed the reimbursement payment from the Facility Defendants consistent with the parties' Agreements, Outstanding Invoices, and Medicaid Act depends on the surrounding agreements, Acts, circumstances, and intent of the services provided pursuant to a contract under Section 1396b(m).

197.   Further, a controversy has arisen between the Facility Defendants and Plaintiff as it pertains to the form of payment for the services provided.

198.   Accordingly, Plaintiff has been damaged in the amount of the Outstanding Invoices and are being directly deprived of a their right in violation of 42 U.S.C. § 1983.

199.   Plaintiff's right to receive payment under the Medicaid Act is dependent on this declaration.

200.   Plaintiff is not required to exhaust any administrative remedies for this action, as no such administrative remedies exist for a dispute of this nature, and for the quantity in dispute.

201.   Plaintiff asserts that it is entitled to payment for services rendered to the Facility Defendants patients consistent with 42 U.S.C. § 1396u-2(f).

202.   Indeed, Plaintiff has a clear right to the relief sought in light of the Act, services rendered, and the parties' Agreements.

203.   Plaintiff has no other adequate remedy at law.

204.    The Facility Defendants have a clearly defined and peremptory duty to do the act in question.

205.    Accordingly, Plaintiff is in doubt as to his rights and required a declaration from the Court to resolve the dispute between the parties.

**WHEREFORE**, Plaintiff, TRD, respectfully requests that this Court enter judgment for against the Facility Defendants declaring that the said Defendants have to remit payment to Plaintiff consistent with the Medicaid Act as it pertains to the Outstanding Invoices, provided that Defendants have sought and received reimbursement from the CMS, and therefore, must remit payment to Plaintiff as directed by 42 U.S.C. § 1396u-2(f) because Federal PPP loans for Covid-19 relief is not a governmental payment made in lieu of reimbursement for services provided under the Act, and such other relief as this Court deems just and proper.

## COUNT IV - FALSE CLAIMS FOR MEDICAID REIMBURSEMENT
### (RECHE CANYON, BIRDMONT, TRINITY, PINES, ST. PETE, TAPPAHANNOCK, BOTETOURT, WHITE OAK, SPRINGHILL AND GREENBRIER)

206.    Plaintiff re-alleges and re-incorporates the allegations contained in paragraphs 1 through 150, as if fully set forth herein.

207.    Plaintiff asserts this claim for treble damages and penalties under the False Claim Act ("FCA"), 31 U.S.C. § 3729-32 *et seq.*, as amended.

208.    Through the acts described above, the Facility Defendants knowingly represented and/or caused to be presented to the Government false or fraudulent

claims for payment or approval of reimbursement for Medicaid Payments pertaining to the Outstanding Invoices.

209.    Specifically, the Facility Defendants submitted to the CMS certain claims for reimbursement, knowing, it did not provide said services and refusing to comply with the provisions of the Medicaid Act by refusing to reimburse Plaintiff while claiming said services were already paid to Plaintiff through Federal PPP Loans for Covid-19 relief. Therefore, the Facility Defendants have directly submitted a false claim for reimbursement under the Medicaid Act.

210.    Indeed, Plaintiff maintained a contract with each of the Facility Defendants, namely, the Reche Canyon TSA, Birdmont TSA, Trinity TSA, Pines TSA, St. Pete TSA, Tappahannock TSA, Botetourt TSA, White Oak TSA and the Greenbrier TSA (collectively the "Agreements") to provide services to its respective patients who are covered under the Medicaid Act and to receive payment through reimbursement received by CMS under the Medicaid Act.

211.    A contract under Section 1396b(m) with a Medicaid managed care organization shall provide that the organization, i.e., the Facility Defendants, shall make payment to the healthcare providers, i.e. Plaintiff, for items and services which are subject to the contract and that are furnished to individuals eligible for medical assistance under the State plan under this Act who are enrolled with the organization on a timely basis, consistent with the claims payment procedure described in section 1396a(a)(37)(A). See, 42 U.S.C. § 1396u-2(f) .

212.   In order to receive payment from Medicaid, the Medicaid managed care organization must submit claims for reimbursement to the government by submitting the information for (i) the eligible beneficiary, (ii) the services provided, and  (iii) the amount of expenses relative to said services together with all other requirements under the Act.

213.   If the services are confirmed, then CMS is required remit payment to the Medicaid managed care organization, in turn, the organization is to remit payment to the direct service provider, consistent with the Medicaid Act.

214.   Here, it seems as if the Facility Defendants have defrauded the government through the reimbursement claims as they have failed and refuse to remit payment to Plaintiff for same.

215.   The FCA imposes civil liability on anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A).

216.   Indeed, Plaintiff timely and properly submitted the Outstanding Invoices and all other pertinent information and documentation for the Facility Defendants to obtain the reimbursement from the CMS.

217.   The Facility Defendants submitted the claims and Outstanding Invoices for reimbursement, received the payment from the CMS, yet have failed to and/or are refusing to remit the reimbursement to Plaintiff in direct violation of the Medicaid Act and for their own benefit .

218.    There is no provision, express or implied, in the Act permitting a SNF to alter federal standards to suit its budgetary needs. While participation is voluntary, it must strictly adhere to the requirements and obligations of the Medicaid Act.

219.    Notwithstanding, the Facility Defendants have refused to make payment to Plaintiff claiming that Plaintiff received Federal PPP loans, which were received in lieu of the Medicaid reimbursement payments pertaining to the Outstanding Invoices, yet submitted a legally false claim for reimbursement, directly defrauding the government for same.

220.    The Government, unaware of the falsity of the claims made or caused to be made by the Facility Defendants, has approved, paid, and reimbursed for the services provided by Plaintiff under the Act and the parties' Agreements.

221.    By reason of these payments and approvals, the Government has been damaged and continues to be damaged, for paying for services provided under the Medicaid Act, all while the Facility Defendants claim that reimbursement is not warranted to Plaintiff because Plaintiff already received a PPP loan in lieu of Medicaid reimbursements.

222.    Additionally, the United States is entitled to maximum penalty for each and every violation alleged herein.

**WHEREFORE**, Plaintiff, TRD, respectfully requests that this Court enter judgment for treble damages against the Facility Defendants, including actual damages, consequential damages, costs, pre and post-judgment interest, and such other relief as this Court deems just and proper.

## COUNT V – CONVERSION OF MEDICAID REIMBURSEMENT
### (RECHE CANYON, BIRDMONT, TRINITY, PINES, ST. PETE, TAPPAHANNOCK, BOTETOURT, WHITE OAK, SPRINGHILL AND GREENBRIER)

223.   Plaintiff re-alleges and re-incorporates the allegations contained in paragraphs 1 through 150, as if fully set forth herein.

224.   Plaintiff asserts a cause of action for conversion of the reimbursement made by CMS pertaining to the Outstanding Invoices for services rendered to the patients of the Facility Defendants.

225.   Specifically, the Facility Defendants misappropriated and asserted dominion over Plaintiff's property, including the Medicaid reimbursement funds received by the CMS as it pertains to the Outstanding Invoices.

226.   Once Plaintiff rendered the services to the Facility Defendants' patients, and the Facility Defendant filed a claim for reimbursement, said funds became the property and/or property interest of Plaintiff.

227.   the Facility Defendants received large sums of money from CMS that was never applied to the Outstanding Invoices for services provided by Plaintiff and are presently under the dominion of the Facility Defendants.

228.   Further, the Facility Defendants claim that because Federal PPP loans were received for Covid-19 relief, then no reimbursement is due, and therefore misappropriated either government funds or Plaintiff's funds for their own personal benefit or use in business projects/services unrelated to Plaintiff.

229.   as alleged above, these actions (and others) and Facility Defendants' continued retention of Plaintiff's property is inconsistent with the requirements for compliance under the Medicaid Act.

230.   Indeed, as demonstrated through the Outstanding Invoices, the funds are easily and directly identifiable for purposes of conversion.

231.   The Facility Defendants do not have a legal or rightful possession to Plaintiff's property.

232.   Plaintiff has made demands to the Facility Defendants for the return of its property and to remit the reimbursement payment to Plaintiff for services rendered to no avail.

233.   As a direct and proximate result of the above-referenced acts, Plaintiff suffered monetary damages in the amount of the Outstanding Invoices, exclusive of interest.

**WHEREFORE**, Plaintiff, TRD, respectfully requests that this Court enter judgment for damages against the Facility Defendants, including actual damages, consequential damages, costs, pre and post-judgment interest, and such other relief as this Court deems just and proper.

### COUNT VI –TORTIOUS INTERFERENCE WITH A CONTRACT
### (ARK)

234.   Plaintiff re-alleges and re-incorporates the allegations contained in paragraphs 1 through 150, as if fully set forth herein.

235.   At all material times hereto, Plaintiff TRD is and has been a party to, without limitation, each of the following contracts: (i) the Reche Canyon TSA, (ii) the Birdmont TSA, (iii) the Pines TSA, (iv) the Tappahannock TSA, (v) the Botetourt TSA, (vi) the White Oak TSA, (vii) the Springhill TSA, and (viii) the Greenbrier TSA (collectively, the "TSAs"); (vi) the Centra Healthcare Solutions agreement (the "Centra Healthcare Agreement"), (vii) CoreMedical Group Agreement (the "Core Medical Agreement"), (viii) the Jackson Therapy Partners Agreement (the "Jackson Therapy Agreement"), and (ix) the Fusion Medical Staffing, LLC Agreement (the "Fusion Medical Agreement") (collectively with the Centra Health Care Agreement, CoreMedical Agreement, and the Jackson Therapy Agreement, the "3rd Party Contracts").

236.   At all material times hereto, Defendant ARK has had knowledge and otherwise been aware regarding the existence of the respective TSAs and Plaintiff's involvement with same.

237.   At all material times hereto, Defendant ARK has had knowledge and otherwise been aware regarding the existence of the respective 3rd Party Contracts and Plaintiff's involvement with same.

238.   On or about March 28, 2023, Defendant ARK, on behalf of each of the TSA counterparties, sent the Termination Notice to TRD, purporting to terminate each of the respective TSAs as of the Termination Date, and triggering the Defendants respective payment obligations owed to TRD thereunder.

239.    Notwithstanding the obligations of each of the Defendants to make payment to TRD pursuant to the terms of their respective TSAs, Defendant ARK intentionally caused each of the Defendants to breach their obligations owed to TRD thereunder by, without limitation, failing to make payment to TRD for Rehabilitation Services provided in accordance with the terms of the respective agreements with Defendants and unlawfully and improperly withholding reimbursement received from Medicaid for services rendered by TRD in accordance with their contractual obligations.

240.    Likewise, as a result of Defendant ARK's unlawful conduct as described herein, Defendant ARK intentionally caused Plaintiff to default on its obligations and breach each of the 3rd Party Contracts.

241.    Defendant ARK's intentional procurement of each Defendants' breach under the terms of its respective TSAs with Plaintiff was committed in the absence of justification or privilege on the part of Defendant ARK.

242.    Likewise, ARK's intentional procurement of Plaintiff's breach under the terms of its respective 3rd Party Contracts was committed in the absence of justification or privilege on the part of Defendant ARK.

243.    As a result of the respective breaches committed by each of the Defendants under the terms of their respective TSA, as intentionally procured by Defendant ARK, Plaintiff has suffered damages.

244.   Similarly, as a result of Defendant ARK's unjustified interference with Plaintiff's ability to perform under the terms of its respective 3rd Party Contracts, Plaintiff has suffered further damages.

**WHEREFORE**, Plaintiff, TRD, respectfully requests that this Court enter judgment for damages against Defendant ARK, including actual damages, consequential damages, costs, pre and post-judgment interest, and such other relief as this Court deems just and proper.

## COUNT VII –TORTIOUS INTERFERENCE WITH AN ADVANTAGEOUS BUSINESS RELATIONSHIP
### (ARK)

245.   Plaintiff re-alleges and re-incorporates the allegations contained in paragraphs 1 through 150, as if fully set forth herein.

246.   At all material times hereto, Plaintiff TRD is and has been a party to, without limitation, the TSAs.

247.   At all material times hereto, Defendant ARK has had knowledge and otherwise been aware regarding the existence of the respective TSAs and Plaintiff's involvement with same.

248.   Notwithstanding the foregoing, Defendant ARK intentionally and unjustifiably interfered with Plaintiff's relationship under each of the TSAs.

249.   As a result of Defendant ARK's intentional and unjustified interference with Plaintiff's relationship under each of the TSAs, Plaintiff has suffered damages.

**WHEREFORE**, Plaintiff, TRD, respectfully requests that this Court enter

judgment for damages against Defendant ARK, including actual damages, consequential damages, costs, pre and post-judgment interest, and such other relief as this Court deems just and proper.

## COUNT VIII –BREACH OF CONTRACT
### (RECHE CANYON)

250.   Plaintiff re-alleges and re-incorporates the allegations contained in paragraphs 1 through 150, as if fully set forth herein.

251.   Plaintiff and Defendant Reche Canyon entered into the Reche Canyon TSA.

252.   Pursuant to the terms of the Reche Canyon TSA, Defendant Reche Canyon was required to make payment to Plaintiff for Rehabilitation Services provided by TRD to patients of the Reche Canyon Facility in accordance with the terms therein.

253.   Notwithstanding Defendant Reche Canyon's obligations to make payment to TRD pursuant to the terms of the Reche Canyon TSA, Defendant Reche Canyon materially breached said contract with Plaintiff by, without limitation, failing to make payment to TRD for Rehabilitation Services rendered thereunder.

254.   As a result of Defendant Reche Canyon's material breaches of the Reche Canyon TSA, Plaintiff has suffered damages.

255.   Pursuant to Section 20 of the Reche Canyon TSA, Plaintiff is entitled to recover its reasonable attorney's fees and costs incurred as a result of Defendant Reche Canyon's breaches of the Reche Canyon TSA.

**WHEREFORE**, Plaintiff, TRD, respectfully requests that this Court enter judgment for damages against Defendant Reche Canyon, including actual damages, consequential damages, reasonable attorney's fees. costs, pre and post-judgment interest, and such other relief as this Court deems just and proper.

## COUNT IX – BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (RECHE CANYON)

256.   Plaintiff re-alleges and re-incorporates the allegations contained in paragraphs 1 through 150, as if fully set forth herein.

257.   The Reche Canyon TSA is a valid and binding contract between Plaintiff TRD and Defendant Reche Canyon relating to the providing of Rehabilitation Services by TRD to patients at the Reche Canyon Facility.

258.   The Reche Canyon TSA requires that Defendant Reche Canyon properly comply with all Medicare policies regarding Therapy Services furnished by TRD pursuant to the Reche Canyon TSA.

259.   Plaintiff has performed all of its obligations under Reche Canyon TSA, including all such conditions precedent for payment thereunder.

260.   Notwithstanding, Defendant Reche Canyon has consciously and deliberately refused to comply with its duties owed to Plaintiff under the terms of the Reche Canyon TSA including, without limitation, failing to comply with all requisite Medicare policies thereunder, including failing to remit payments to TRD for Rehabilitation Services provided and withholding payments for which Defendant

Reche Canyon received reimbursement for from Medicare on behalf of its patients at the Reche Canyon Facility.

261.   Defendant Reche Canyon's conscious and deliberate refusal to abide by the terms of the Reche Canyon TSA has unfairly frustrated the agreed common purpose of such therapy services agreement and disappointed the reasonable expectations of Plaintiff.

262.   Plaintiff TRD has been deprived of the benefits under the terms of the Reche Canyon TSA as a direct consequence of Defendant Reche Canyon's conscious and deliberate conduct thereunder.  As a result, Plaintiff has experienced significant losses.

263.   Pursuant to Section 20 of the Reche Canyon TSA, Plaintiff is entitled to recover its reasonable attorney's fees and costs incurred as a result of Defendant Reche Canyon's breaches of the Reche Canyon TSA.

**WHEREFORE**, Plaintiff TRD respectfully requests that this Court enter judgment for damages against Defendant Reche Canyon including actual damages, reasonable attorneys' fees, costs, pre and post-judgment interest, and such other relief as this Court deems just and proper.

## COUNT X –UNJUST ENRICHMENT (PLED IN THE ALTERNATIVE TO COUNT VIII)
### (RECHE CANYON)

264.   Plaintiff re-alleges and re-incorporates the allegations contained in paragraphs 1 through 39, 44, 47, and 49, as if fully set forth herein.

265.    Plaintiff conferred a benefit on Defendant Reche Canyon by, without limitation, providing Rehabilitation Services to patients of the Reche Canyon Facility.

266.    Defendant Reche Canyon received and accepted the benefit conferred on them by Plaintiff.

267.    Defendant Reche Canyon had knowledge of the benefit conferred on it by Plaintiff.

268.    The circumstances are such that it would be inequitable to allow Defendant Reche Canyon to retain the benefits conferred on it by Plaintiff without paying TRD the full value thereof.

**WHEREFORE**, Plaintiff TRD demands judgment against Defendant Reche Canyon for monetary damages, compensatory damages, attorney's fees and costs, treble damages, and for any further relief this Court may deem just and proper.

## COUNT XI – QUANTUM MERUIT (PLED IN THE ALTERNATIVE TO COUNT VIII) (RECHE CANYON)

269.    Plaintiff re-alleges and re-incorporates the allegations contained in paragraphs 1 through 39, 44, 47, and 49, as if fully set forth herein.

270.    Plaintiff TRD has conferred or caused to be conferred a benefit upon Defendant Reche Canyon including, without limitation, providing Rehabilitation Services to patients of the Reche Canyon Facility.

271.    Defendant Reche Canyon accepted the Rehabilitation Services provided to their patients of the Reche Canyon Facility and was aware at all times that TRD expected to be paid for such services.

272.    Under ordinary circumstances, a reasonable person would reasonably expect to pay for such services.

273.    Notwithstanding, Defendant Reche Canyon failed to make payment to TRD for the benefits conferred upon it.

274.    As a result of Defendant Reche Canyon's failure to pay for the above benefits, Plaintiff TRD has been damaged.

**WHEREFORE**, Plaintiff TRD demands judgment against Defendant Reche Canyon for monetary damages, compensatory damages, attorney's fees and costs, treble damages, and for any further relief this Court may deem just and proper.

## COUNT XII- BREACH OF CONTRACT
### (BIRDMONT)

275.    Plaintiff re-alleges and re-incorporates the allegations contained in paragraphs 1 through 150, as if fully set forth herein.

276.    Plaintiff and Defendant Birdmont entered into the Birdmont TSA.

277.    Pursuant to the terms of the Birdmont TSA, Defendant Birdmont was required to make payment to Plaintiff for Rehabilitation Services provided by TRD to patients of the Birdmont Facility in accordance with the terms therein.

278.    Notwithstanding Defendant Birdmont's obligations to make payment to TRD pursuant to the terms of the Birdmont TSA, Defendant Birdmont materially breached said contract with Plaintiff by, without limitation, failing to make payment to TRD for Rehabilitation Services rendered thereunder.

279.    As a result of Defendant Birdmont's material breaches of the Birdmont TSA, Plaintiff has suffered damages.

280.    Pursuant to Section 20 of the Birdmont TSA, Plaintiff is entitled to recover its reasonable attorney's fees and costs incurred as a result of Defendant Birdmont's breaches of the Birdmont TSA.

**WHEREFORE**, Plaintiff, TRD, respectfully requests that this Court enter judgment for damages against Defendant Birdmont, including actual damages, consequential damages, reasonable attorney's fees. costs, pre and post-judgment interest, and such other relief as this Court deems just and proper.

## COUNT XIII – BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (BIRDMONT)

281.    Plaintiff re-alleges and re-incorporates the allegations contained in paragraphs 1 through 150, as if fully set forth herein.

282.    The Birdmont TSA is a valid and binding contract between Plaintiff TRD and Defendant Birdmont relating to the providing of Rehabilitation Services by TRD to patients at the Birdmont Facility.

283.    The Birdmont TSA requires that Defendant Birdmont properly comply with all Medicare policies regarding Therapy Services furnished by TRD pursuant to the Birdmont TSA.

284.    Plaintiff has performed all of its obligations under Birdmont TSA, including all such conditions precedent for payment thereunder.

285.   Notwithstanding, Defendant Birdmont has consciously and deliberately refused to comply with its duties owed to Plaintiff under the terms of the Birdmont TSA including, without limitation, failing to comply with all requisite Medicare policies thereunder, including failing to remit payments to TRD for Rehabilitation Services provided and withholding payments for which Defendant Birdmont received reimbursement for from Medicare on behalf of its patients at the Birdmont Facility.

286.   Defendant Birdmont's conscious and deliberate refusal to abide by the terms of the Birdmont TSA has unfairly frustrated the agreed common purpose of such therapy services agreement and disappointed the reasonable expectations of Plaintiff.

287.   Plaintiff TRD has been deprived of the benefits under the terms of Birdmont TSA as a direct consequence of Defendant Birdmont's conscious and deliberate conduct thereunder.  As a result, Plaintiff has experienced significant losses.

288.   Pursuant to Section 20 of the Birdmont TSA, Plaintiff is entitled to recover its reasonable attorney's fees and costs incurred as a result of Defendant Birdmont's breaches of the Birdmont TSA.

**WHEREFORE**, Plaintiff TRD respectfully requests that this Court enter judgment for damages against Defendant Birdmont including actual damages, reasonable attorneys' fees, costs, pre and post-judgment interest, and such other relief as this Court deems just and proper.

## COUNT XIV –UNJUST ENRICHMENT (PLED IN THE ALTERNATIVE TO COUNT XII)
### (BIRDMONT)

289.   Plaintiff re-alleges and re-incorporates the allegations contained in paragraphs1 through 39, 52, 55, 57-59, as if fully set forth herein.

290.   Plaintiff conferred a benefit on Defendant Birdmont by, without limitation, providing Rehabilitation Services to patients of the Birdmont Facility.

291.   Defendant Birdmont received and accepted the benefit conferred on them by Plaintiff.

292.   Defendant Birdmont had knowledge of the benefit conferred on it by Plaintiff.

293.   The circumstances are such that it would be inequitable to allow Defendant Birdmont to retain the benefits conferred on it by Plaintiff without paying TRD the full value thereof.

**WHEREFORE**, Plaintiff TRD demands judgment against Defendant Birdmont for monetary damages, compensatory damages, attorney's fees and costs, treble damages, and for any further relief this Court may deem just and proper.

## COUNT XV – QUANTUM MERUIT (PLED IN THE ALTERNATIVE TO COUNT XII)
### (BIRDMONT)

294.   Plaintiff re-alleges and re-incorporates the allegations contained in paragraphs 1 through 39, 52, 55, 57-59, as if fully set forth herein.

295. Plaintiff TRD has conferred or caused to be conferred a benefit upon Defendant Birdmont including, without limitation, providing Rehabilitation Services to patients of Birdmont Facility.

296. Defendant Birdmont accepted the Rehabilitation Services provided to their patients of the Birdmont Facility and was aware at all times that TRD expected to be paid for such services.

297. Under ordinary circumstances, a reasonable person would reasonably expect to pay for such services.

298. Notwithstanding, Defendant Birdmont failed to make payment to TRD for the benefits conferred upon it.

299. As a result of Defendant Birdmont's failure to pay for the above benefits, Plaintiff TRD has been damaged.

**WHEREFORE**, Plaintiff TRD demands judgment against Defendant Birdmont for monetary damages, compensatory damages, attorney's fees and costs, treble damages, and for any further relief this Court may deem just and proper.

## COUNT XVI- BREACH OF CONTRACT
### (PINES)

300. Plaintiff re-alleges and re-incorporates the allegations contained in paragraphs 1 through 150, as if fully set forth herein.

301. Plaintiff and Defendant Pines entered into the Pines TSA.

302.   Pursuant to the terms of the Pines TSA, Defendant Pines was required to make payment to Plaintiff for Rehabilitation Services provided by TRD to patients of the Pines Facility in accordance with the terms therein.

303.   Notwithstanding Defendant Pines' obligations to make payment to TRD pursuant to the terms of the Pines TSA, Defendant Pines materially breached said contract with Plaintiff by, without limitation, failing to make payment to TRD for Rehabilitation Services rendered thereunder.

304.   As a result of Defendant Pines' material breaches of the Pines TSA, Plaintiff has suffered damages.

305.   Pursuant to Section 20 of the Pines TSA, Plaintiff is entitled to recover its reasonable attorney's fees and costs incurred as a result of Defendant Pines' breaches of the Pines TSA.

**WHEREFORE**, Plaintiff, TRD, respectfully requests that this Court enter judgment for damages against Defendant Pines, including actual damages, consequential damages, reasonable attorney's fees. costs, pre and post-judgment interest, and such other relief as this Court deems just and proper.

## COUNT XVII– BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (PINES)

306.   Plaintiff re-alleges and re-incorporates the allegations contained in paragraphs 1 through 150, as if fully set forth herein.

307.  The Pines TSA is a valid and binding contract between Plaintiff TRD and Defendant Pines relating to the providing of Rehabilitation Services by TRD to patients at the Pines Facility.

308.  The Pines TSA requires that Defendant Pines properly comply with all Medicare policies regarding Therapy Services furnished by TRD pursuant to the Pines TSA.

309.  Plaintiff has performed all of its obligations under Pines TSA, including all such conditions precedent for payment thereunder.

310.  Notwithstanding, Defendant Pines has consciously and deliberately refused to comply with its duties owed to Plaintiff under the terms of the Pines TSA including, without limitation, failing to comply with all requisite Medicare policies thereunder, including failing to remit payments to TRD for Rehabilitation Services provided and withholding payments for which Defendant Pines received reimbursement for from Medicare on behalf of its patients at the Pines Facility.

311.  Defendant Pines' conscious and deliberate refusal to abide by the terms of the Pines TSA has unfairly frustrated the agreed common purpose of such therapy services agreement and disappointed the reasonable expectations of Plaintiff.

312.  Plaintiff TRD has been deprived of the benefits under the terms of Pines TSA as a direct consequence of Defendant Pines' conscious and deliberate conduct thereunder.  As a result, Plaintiff has experienced significant losses.

313.   Pursuant to Section 20 of the Pines TSA, Plaintiff is entitled to recover its reasonable attorney's fees and costs incurred as a result of Defendant Pines' breaches of the Pines TSA.

**WHEREFORE**, Plaintiff TRD respectfully requests that this Court enter judgment for damages against Defendant Pines including actual damages, reasonable attorneys' fees, costs, pre and post-judgment interest, and such other relief as this Court deems just and proper.

## COUNT XVIII –UNJUST ENRICHMENT (PLED IN THE ALTERNATIVE TO COUNT XVI)
### (PINES)

314.   Plaintiff re-alleges and re-incorporates the allegations contained in paragraphs 1 through 39, 75-78, as if fully set forth herein.

315.   Plaintiff conferred a benefit on Defendant Pines by, without limitation, providing Rehabilitation Services to patients of the Pines Facility.

316.   Defendant Pines received and accepted the benefit conferred on them by Plaintiff.

317.   Defendant Pines had knowledge of the benefit conferred on it by Plaintiff.

318.   The circumstances are such that it would be inequitable to allow Defendant Pines to retain the benefits conferred on it by Plaintiff without paying TRD the full value thereof.

**WHEREFORE**, Plaintiff TRD demands judgment against Defendant Pines for monetary damages, compensatory damages, attorney's fees and costs, treble damages, and for any further relief this Court may deem just and proper.

## COUNT XIX – QUANTUM MERUIT (PLED IN THE ALTERNATIVE TO COUNT XVI)
### (PINES)

319.   Plaintiff re-alleges and re-incorporates the allegations contained in paragraphs 1 through 39, 75-78, as if fully set forth herein.

320.   Plaintiff TRD has conferred or caused to be conferred a benefit upon Defendant Pines including, without limitation, providing Rehabilitation Services to patients of Pines Facility.

321.   Defendant Pines accepted the Rehabilitation Services provided to their patients of the Pines Facility and was aware at all times that TRD expected to be paid for such services.

322.   Under ordinary circumstances, a reasonable person would reasonably expect to pay for such services.

323.   Notwithstanding, Defendant Pines failed to make payment to TRD for the benefits conferred upon it.

324.   As a result of Defendant Pines' failure to pay for the above benefits, Plaintiff TRD has been damaged.

**WHEREFORE**, Plaintiff TRD demands judgment against Defendant Pines for monetary damages, compensatory damages, attorney's fees and costs, treble damages, and for any further relief this Court may deem just and proper.

## COUNT XX- BREACH OF CONTRACT
### (ST. PETE)

325.    Plaintiff re-alleges and re-incorporates the allegations contained in paragraphs 1 through 150, as if fully set forth herein.

326.    Plaintiff and Defendant St. Pete  entered into the St. Pete TSA.

327.    Pursuant to the terms of the St. Pete TSA, Defendant St. Pete was required to make payment to Plaintiff for Rehabilitation Services provided by TRD to patients of the St. Pete Facility in accordance with the terms therein.

328.    Notwithstanding Defendant St. Pete's obligations to make payment to TRD pursuant to the terms of the St. Pete TSA, Defendant St. Pete materially breached said contract with Plaintiff by, without limitation, failing to make payment to TRD for Rehabilitation Services rendered thereunder.

329.    As a result of Defendant St. Pete's material breaches of the St. Pete TSA, Plaintiff has suffered damages.

330.    Pursuant to Section 20 of the St. Pete TSA, Plaintiff is entitled to recover its reasonable attorney's fees and costs incurred as a result of Defendant St. Pete's breaches of the St. Pete TSA.

**WHEREFORE**, Plaintiff, TRD, respectfully requests that this Court enter judgment for damages against Defendant St. Pete, including actual damages, consequential damages, reasonable attorney's fees. costs, pre and post-judgment interest, and such other relief as this Court deems just and proper.

## COUNT XXI– BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

**(ST PETE)**

331.   Plaintiff re-alleges and re-incorporates the allegations contained in paragraphs 1 through 150, as if fully set forth herein.

332.   The St. Pete TSA is a valid and binding contract between Plaintiff TRD and Defendant St. Pete relating to the providing of Rehabilitation Services by TRD to patients at the St. Pete Facility.

333.   The St. Pete TSA requires that Defendant St. Pete properly comply with all Medicare policies regarding Therapy Services furnished by TRD pursuant to the St. Pete TSA.

334.   Plaintiff has performed all of its obligations under St. Pete TSA, including all such conditions precedent for payment thereunder.

335.   Notwithstanding, Defendant St. Pete has consciously and deliberately refused to comply with its duties owed to Plaintiff under the terms of the St. Pete TSA including, without limitation, failing to comply with all requisite Medicare policies thereunder, including failing to remit payments to TRD for Rehabilitation Services provided and withholding payments for which Defendant St. Pete received reimbursement for from Medicare on behalf of its patients at the St. Pete Facility.

336.   Defendant St. Pete's conscious and deliberate refusal to abide by the terms of the St. Pete TSA has unfairly frustrated the agreed common purpose of such therapy services agreement and disappointed the reasonable expectations of Plaintiff.

337.    Plaintiff TRD has been deprived of the benefits under the terms of St. Pete TSA as a direct consequence of Defendant St. Pete's conscious and deliberate conduct thereunder.  As a result, Plaintiff has experienced significant losses.

338.    Pursuant to Section 20 of the St. Pete TSA, Plaintiff is entitled to recover its reasonable attorney's fees and costs incurred as a result of Defendant St. Pete's breaches of the St. Pete TSA.

**WHEREFORE**, Plaintiff TRD respectfully requests that this Court enter judgment for damages against Defendant St. Pete including actual damages, reasonable attorneys' fees, costs, pre and post-judgment interest, and such other relief as this Court deems just and proper.

## COUNT XXII –UNJUST ENRICHMENT (PLED IN THE ALTERNATIVE TO COUNT XX)
### (ST. PETE)

339.    Plaintiff re-alleges and re-incorporates the allegations contained in paragraphs 1 through 39, 85-89, as if fully set forth herein.

340.    Plaintiff conferred a benefit on Defendant St. Pete by, without limitation, providing Rehabilitation Services to patients of the St. Pete Facility.

341.    Defendant St. Pete received and accepted the benefit conferred on them by Plaintiff.

342.    Defendant St. Pete had knowledge of the benefit conferred on it by Plaintiff.

343.   The circumstances are such that it would be inequitable to allow Defendant St. Pete to retain the benefits conferred on it by Plaintiff without paying TRD the full value thereof.

**WHEREFORE**, Plaintiff TRD demands judgment against Defendant St. Pete for monetary damages, compensatory damages, attorney's fees and costs, treble damages, and for any further relief this Court may deem just and proper.

## COUNT XXIII – QUANTUM MERUIT (PLED IN THE ALTERNATIVE TO COUNT XX)
### (ST. PETE)

344.   Plaintiff re-alleges and re-incorporates the allegations contained in paragraphs 1 through 39, 85-89, as if fully set forth herein.

345.   Plaintiff TRD has conferred or caused to be conferred a benefit upon Defendant St. Pete including, without limitation, providing Rehabilitation Services to patients of St. Pete Facility.

346.   Defendant St. Pete accepted the Rehabilitation Services provided to their patients of the St. Pete Facility and was aware at all times that TRD expected to be paid for such services.

347.   Under ordinary circumstances, a reasonable person would reasonably expect to pay for such services.

348.   Notwithstanding, Defendant St. Pete failed to make payment to TRD for the benefits conferred upon it.

349.   As a result of Defendant St. Pete's failure to pay for the above benefits, Plaintiff TRD has been damaged.

**WHEREFORE**, Plaintiff TRD demands judgment against Defendant St. Pete for monetary damages, compensatory damages, attorney's fees and costs, treble damages, and for any further relief this Court may deem just and proper.

<div align="center">

**COUNT XXIV**
**BREACH OF CONTRACT**
**(TAPPAHANNOCK)**

</div>

350.   Plaintiff re-alleges and re-incorporates the allegations contained in paragraphs 1 through 150, as if fully set forth herein.

351.   Plaintiff and Defendant Tappahannock entered into the Tappahannock TSA.

352.   Pursuant to the terms of the Tappahannock TSA, Defendant Tappahannock was required to make payment to Plaintiff for Rehabilitation Services provided by TRD to patients of the Tappahannock Facility in accordance with the terms therein.

353.   Notwithstanding Defendant Tappahannock's obligations to make payment to TRD pursuant to the terms of the Tappahannock TSA, Defendant Tappahannock materially breached said contract with Plaintiff by, without limitation, failing to make payment to TRD for Rehabilitation Services rendered thereunder.

354.   As a result of Defendant Tappahannock's material breaches of the Tappahannock TSA, Plaintiff has suffered damages.

355.   Pursuant to Section 20 of the Tappahannock TSA, Plaintiff is entitled to recover its reasonable attorney's fees and costs incurred as a result of Defendant Tappahannock's breaches of the Tappahannock TSA.

**WHEREFORE**, Plaintiff, TRD, respectfully requests that this Court enter judgment for damages against Defendant Tappahannock, including actual damages, consequential damages, reasonable attorney's fees. costs, pre and post-judgment interest, and such other relief as this Court deems just and proper.

## COUNT XXV– BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
## (TAPPAHANNOCK)

356. Plaintiff re-alleges and re-incorporates the allegations contained in paragraphs 1 through 150, as if fully set forth herein.

357. The Tappahannock TSA is a valid and binding contract between Plaintiff TRD and Defendant Tappahannock relating to the providing of Rehabilitation Services by TRD to patients at the Tappahannock Facility.

358. The Tappahannock TSA requires that Defendant Tappahannock properly comply with all Medicare policies regarding Therapy Services furnished by TRD pursuant to the Tappahannock TSA.

359. Plaintiff has performed all of its obligations under Tappahannock TSA, including all such conditions precedent for payment thereunder.

360. Notwithstanding, Defendant Tappahannock has consciously and deliberately refused to comply with its duties owed to Plaintiff under the terms of the Tappahannock TSA including, without limitation, failing to comply with all requisite Medicare policies thereunder, including failing to remit payments to TRD for Rehabilitation Services provided and withholding payments for which Defendant

Tappahannock received reimbursement for from Medicare on behalf of its patients at the Tappahannock Facility.

361.   Defendant Tappahannock's conscious and deliberate refusal to abide by the terms of the Tappahannock TSA has unfairly frustrated the agreed common purpose of such therapy services agreement and disappointed the reasonable expectations of Plaintiff.

362.   Plaintiff TRD has been deprived of the benefits under the terms of Tappahannock TSA as a direct consequence of Defendant Tappahannock's conscious and deliberate conduct thereunder.  As a result, Plaintiff has experienced significant losses.

363.   Pursuant to Section 20 of the Tappahannock TSA, Plaintiff is entitled to recover its reasonable attorney's fees and costs incurred as a result of Defendant Tappahannock's breaches of the Tappahannock TSA.

**WHEREFORE**, Plaintiff TRD respectfully requests that this Court enter judgment for damages against Defendant Tappahannock including actual damages, reasonable attorneys' fees, costs, pre and post-judgment interest, and such other relief as this Court deems just and proper.

### COUNT XXVI –UNJUST ENRICHMENT (PLED IN THE ALTERNATIVE TO COUNT XXIV) (TAPPAHANNOCK)

364.   Plaintiff re-alleges and re-incorporates the allegations contained in paragraphs 1 through 39, 95-99 as if fully set forth herein.

365.   Plaintiff conferred a benefit on Defendant Tappahannock by, without limitation, providing Rehabilitation Services to patients of the Tappahannock Facility.

366.   Defendant Tappahannock received and accepted the benefit conferred on them by Plaintiff.

367.   Defendant Tappahannock had knowledge of the benefit conferred on it by Plaintiff.

368.   The circumstances are such that it would be inequitable to allow Defendant Tappahannock to retain the benefits conferred on it by Plaintiff without paying TRD the full value thereof.

**WHEREFORE**, Plaintiff TRD demands judgment against Defendant Tappahannock for monetary damages, compensatory damages, attorney's fees and costs, treble damages, and for any further relief this Court may deem just and proper.

## COUNT XXVII – QUANTUM MERUIT (PLED IN THE ALTERNATIVE TO COUNT XXIV) (TAPPAHANNOCK)

369.   Plaintiff re-alleges and re-incorporates the allegations contained in paragraphs 1 through 39, 95-99 as if fully set forth herein.

370.   Plaintiff TRD has conferred or caused to be conferred a benefit upon Defendant Tappahannock including, without limitation, providing Rehabilitation Services to patients of Tappahannock Facility.

371.   Defendant Tappahannock accepted the Rehabilitation Services provided to their patients of the Tappahannock Facility and was aware at all times that TRD expected to be paid for such services.

372.     Under ordinary circumstances, a reasonable person would reasonably expect to pay for such services.

373.     Notwithstanding, Defendant Tappahannock failed to make payment to TRD for the benefits conferred upon it.

374.     As a result of Defendant Tappahannock's failure to pay for the above benefits, Plaintiff TRD has been damaged.

**WHEREFORE**, Plaintiff TRD demands judgment against Defendant Tappahannock for monetary damages, compensatory damages, attorney's fees and costs, treble damages, and for any further relief this Court may deem just and proper.

## COUNT XXVIII
## BREACH OF CONTRACT
### (BOTETOURT)

375.     Plaintiff re-alleges and re-incorporates the allegations contained in paragraphs 1 through 150, as if fully set forth herein.

376.     Plaintiff and Defendant Botetourt entered into the Botetourt TSA.

377.     Pursuant to the terms of the Botetourt TSA, Defendant Botetourt was required to make payment to Plaintiff for Rehabilitation Services provided by TRD to patients of the Botetourt Facility in accordance with the terms therein.

378.     Notwithstanding Defendant Tappahannock's obligations to make payment to TRD pursuant to the terms of the Tappahannock TSA, Defendant Tappahannock materially breached said contract with Plaintiff by, without limitation, failing to make payment to TRD for Rehabilitation Services rendered thereunder.

379.   As a result of Defendant Botetourt's material breaches of the Botetourt TSA, Plaintiff has suffered damages.

380.   Pursuant to Section 20 of the Botetourt TSA, Plaintiff is entitled to recover its reasonable attorney's fees and costs incurred as a result of Defendant Botetourt's breaches of the Botetourt TSA.

**WHEREFORE**, Plaintiff, TRD, respectfully requests that this Court enter judgment for damages against Defendant Botetourt, including actual damages, consequential damages, reasonable attorney's fees. costs, pre and post-judgment interest, and such other relief as this Court deems just and proper.

## COUNT XXIX– BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (BOTETOURT)

381.   Plaintiff re-alleges and re-incorporates the allegations contained in paragraphs 1 through 150, as if fully set forth herein.

382.   The Botetourt TSA is a valid and binding contract between Plaintiff TRD and Defendant Botetourt relating to the providing of Rehabilitation Services by TRD to patients at the Botetourt Facility.

383.   The Botetourt TSA requires that Defendant Botetourt properly comply with all Medicare policies regarding Therapy Services furnished by TRD pursuant to the Botetourt TSA.

384.   Plaintiff has performed all of its obligations under Botetourt TSA, including all such conditions precedent for payment thereunder.

385.    Notwithstanding, Defendant Botetourt has consciously and deliberately refused to comply with its duties owed to Plaintiff under the terms of the Botetourt TSA including, without limitation, failing to comply with all requisite Medicare policies thereunder, including failing to remit payments to TRD for Rehabilitation Services provided and withholding payments for which Defendant Botetourt received reimbursement for from Medicare on behalf of its patients at the Botetourt Facility.

386.    Defendant Botetourt's conscious and deliberate refusal to abide by the terms of the Botetourt TSA has unfairly frustrated the agreed common purpose of such therapy services agreement and disappointed the reasonable expectations of Plaintiff.

387.    Plaintiff TRD has been deprived of the benefits under the terms of Botetourt TSA as a direct consequence of Defendant Botetourt's conscious and deliberate conduct thereunder.  As a result, Plaintiff has experienced significant losses.

388.    Pursuant to Section 20 of the Botetourt TSA, Plaintiff is entitled to recover its reasonable attorney's fees and costs incurred as a result of Defendant Botetourt's breaches of the Botetourt TSA.

**WHEREFORE**, Plaintiff TRD respectfully requests that this Court enter judgment for damages against Defendant Botetourt including actual damages, reasonable attorneys' fees, costs, pre and post-judgment interest, and such other relief as this Court deems just and proper.

## COUNT XXX –UNJUST ENRICHMENT (PLED IN THE ALTERNATIVE TO COUNT XXVII)
### (BOTETOURT)

389.   Plaintiff re-alleges and re-incorporates the allegations contained in paragraphs 1 through 39, 106-111, as if fully set forth herein.

390.   Plaintiff conferred a benefit on Defendant Botetourt by, without limitation, providing Rehabilitation Services to patients of the Botetourt Facility.

391.   Defendant Botetourt received and accepted the benefit conferred on them by Plaintiff.

392.   Defendant Botetourt had knowledge of the benefit conferred on it by Plaintiff.

393.   The circumstances are such that it would be inequitable to allow Defendant Botetourt to retain the benefits conferred on it by Plaintiff without paying TRD the full value thereof.

**WHEREFORE**, Plaintiff TRD demands judgment against Defendant Botetourt for monetary damages, compensatory damages, attorney's fees and costs, treble damages, and for any further relief this Court may deem just and proper.

## COUNT XXXI – QUANTUM MERUIT (PLED IN THE ALTERNATIVE TO COUNT XXVII) (BOTETOURT)

394.   Plaintiff re-alleges and re-incorporates the allegations contained in paragraphs 1 through 39, 106-111, as if fully set forth herein.

395.   Plaintiff TRD has conferred or caused to be conferred a benefit upon Defendant Botetourt including, without limitation, providing Rehabilitation Services to patients of Botetourt Facility.

396.   Defendant Botetourt accepted the Rehabilitation Services provided to their patients of the Botetourt Facility and was aware at all times that TRD expected to be paid for such services.

397.   Under ordinary circumstances, a reasonable person would reasonably expect to pay for such services.

398.   Notwithstanding, Defendant Botetourt failed to make payment to TRD for the benefits conferred upon it.

399.   As a result of Defendant Botetourt's failure to pay for the above benefits, Plaintiff TRD has been damaged.

**WHEREFORE**, Plaintiff TRD demands judgment against Defendant Botetourt for monetary damages, compensatory damages, attorney's fees and costs, treble damages, and for any further relief this Court may deem just and proper.

### COUNT XXXII
### BREACH OF CONTRACT
### (WHITE OAK)

400.   Plaintiff re-alleges and re-incorporates the allegations contained in paragraphs 1 through 150, as if fully set forth herein.

401.   Plaintiff and Defendant White Oak entered into the White Oak TSA.

402.   Pursuant to the terms of the White Oak TSA, Defendant White Oak was required to make payment to Plaintiff for Rehabilitation Services provided by TRD to patients of the White Oak Facility in accordance with the terms therein.

403.   Notwithstanding Defendant White Oak's obligations to make payment to TRD pursuant to the terms of the White Oak TSA, Defendant White Oak materially

breached said contract with Plaintiff by, without limitation, failing to make payment to TRD for Rehabilitation Services rendered thereunder.

404.   As a result of Defendant White Oak's material breaches of the White Oak TSA, Plaintiff has suffered damages.

405.   Pursuant to Section 20 of the White Oak TSA, Plaintiff is entitled to recover its reasonable attorney's fees and costs incurred as a result of Defendant White Oak's breaches of the White Oak TSA.

**WHEREFORE**, Plaintiff, TRD, respectfully requests that this Court enter judgment for damages against Defendant White Oak, including actual damages, consequential damages, reasonable attorney's fees. costs, pre and post-judgment interest, and such other relief as this Court deems just and proper.

## COUNT XXXIII– BREACH OF THE IMPLIED COVENANT OF GOOD FAITH
## AND FAIR DEALING
## (WHITE OAK)

406.   Plaintiff re-alleges and re-incorporates the allegations contained in paragraphs 1 through 150, as if fully set forth herein.

407.   The White Oak TSA is a valid and binding contract between Plaintiff TRD and Defendant White Oak relating to the providing of Rehabilitation Services by TRD to patients at the White Oak Facility.

408.   The White Oak TSA requires that Defendant White Oak properly comply with all Medicare policies regarding Therapy Services furnished by TRD pursuant to the White Oak TSA.

409.   Plaintiff has performed all of its obligations under White Oak TSA, including all such conditions precedent for payment thereunder.

410.   Notwithstanding, Defendant White Oak has consciously and deliberately refused to comply with its duties owed to Plaintiff under the terms of the White Oak TSA including, without limitation, failing to comply with all requisite Medicare policies thereunder, including failing to remit payments to TRD for Rehabilitation Services provided and withholding payments for which Defendant White Oak received reimbursement for from Medicare on behalf of its patients at the White Oak Facility.

411.   Defendant White Oak's conscious and deliberate refusal to abide by the terms of the White Oak TSA has unfairly frustrated the agreed common purpose of such therapy services agreement and disappointed the reasonable expectations of Plaintiff.

412.   Plaintiff TRD has been deprived of the benefits under the terms of White Oak TSA as a direct consequence of Defendant White Oak's conscious and deliberate conduct thereunder.  As a result, Plaintiff has experienced significant losses.

413.   Pursuant to Section 20 of the White Oak TSA, Plaintiff is entitled to recover its reasonable attorney's fees and costs incurred as a result of Defendant White Oak's breaches of the White Oak TSA.

**WHEREFORE**, Plaintiff TRD respectfully requests that this Court enter judgment for damages against Defendant White Oak including actual damages, reasonable attorneys' fees, costs, pre and post-judgment interest, and such other relief

as this Court deems just and proper.

## COUNT XXXIV –UNJUST ENRICHMENT (PLED IN THE ALTERNATIVE TO COUNT XXXII)
### (WHITE OAK)

414.    Plaintiff re-alleges and re-incorporates the allegations contained in paragraphs 1 through 39, 119-123, as if fully set forth herein.

415.    Plaintiff conferred a benefit on Defendant White Oak by, without limitation, providing Rehabilitation Services to patients of the White Oak Facility.

416.    Defendant White Oak received and accepted the benefit conferred on them by Plaintiff.

417.    Defendant White Oak had knowledge of the benefit conferred on it by Plaintiff.

418.    The circumstances are such that it would be inequitable to allow Defendant White Oak to retain the benefits conferred on it by Plaintiff without paying TRD the full value thereof.

**WHEREFORE**, Plaintiff TRD demands judgment against Defendant White Oak for monetary damages, compensatory damages, attorney's fees and costs, treble damages, and for any further relief this Court may deem just and proper.

## COUNT XXXV – QUANTUM MERUIT (PLED IN THE ALTERNATIVE TO COUNT XXXII)
### (WHITE OAK)

419.    Plaintiff re-alleges and re-incorporates the allegations contained in paragraphs 1 through 39, 119-123, as if fully set forth herein.

420.   Plaintiff TRD has conferred or caused to be conferred a benefit upon Defendant White Oak including, without limitation, providing Rehabilitation Services to patients of White Oak Facility.

421.   Defendant White Oak accepted the Rehabilitation Services provided to their patients of the White Oak Facility and was aware at all times that TRD expected to be paid for such services.

422.   Under ordinary circumstances, a reasonable person would reasonably expect to pay for such services.

423.   Notwithstanding, Defendant White Oak failed to make payment to TRD for the benefits conferred upon it.

424.   As a result of Defendant White Oak's failure to pay for the above benefits, Plaintiff TRD has been damaged.

**WHEREFORE**, Plaintiff TRD demands judgment against Defendant White Oak for monetary damages, compensatory damages, attorney's fees and costs, treble damages, and for any further relief this Court may deem just and proper.

## COUNT XXXVI
## BREACH OF CONTRACT
### (SPRINGHILL)

425.   Plaintiff re-alleges and re-incorporates the allegations contained in paragraphs 1 through 150, as if fully set forth herein.

426.   Plaintiff and Defendant Springhill entered into the Springhill TSA.

427.    Pursuant to the terms of the Springhill TSA, Defendant Springhill was required to make payment to Plaintiff for Rehabilitation Services provided by TRD to patients of the Springhill Facility in accordance with the terms therein.

428.    Notwithstanding Defendant Springhill's obligations to make payment to TRD pursuant to the terms of the Springhill TSA, Defendant Springhill materially breached said contract with Plaintiff by, without limitation, failing to make payment to TRD for Rehabilitation Services rendered thereunder.

429.    As a result of Defendant Springhill's material breaches of the Springhill TSA, Plaintiff has suffered damages.

430.    Pursuant to Section 20 of the Springhill TSA, Plaintiff is entitled to recover its reasonable attorney's fees and costs incurred as a result of Defendant Springhill's breaches of the Springhill TSA.

**WHEREFORE**, Plaintiff, TRD, respectfully requests that this Court enter judgment for damages against Defendant Springhill, including actual damages, consequential damages, reasonable attorney's fees. costs, pre and post-judgment interest, and such other relief as this Court deems just and proper.

## COUNT XXXVII– BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (SPRINGHILL)

431.    Plaintiff re-alleges and re-incorporates the allegations contained in paragraphs 1 through 150, as if fully set forth herein.

432.   The Springhill TSA is a valid and binding contract between Plaintiff TRD and Defendant Springhill relating to the providing of Rehabilitation Services by TRD to patients at the Springhill Facility.

433.   The Springhill TSA requires that Defendant Springhill properly comply with all Medicare policies regarding Therapy Services furnished by TRD pursuant to the Springhill TSA.

434.   Plaintiff has performed all of its obligations under Springhill TSA, including all such conditions precedent for payment thereunder.

435.   Notwithstanding, Defendant Springhill has consciously and deliberately refused to comply with its duties owed to Plaintiff under the terms of the Springhill TSA including, without limitation, failing to comply with all requisite Medicare policies thereunder, including failing to remit payments to TRD for Rehabilitation Services provided and withholding payments for which Defendant Springhill received reimbursement for from Medicare on behalf of its patients at the Springhill Facility.

436.   Defendant Springhill's conscious and deliberate refusal to abide by the terms of the Springhill TSA has unfairly frustrated the agreed common purpose of such therapy services agreement and disappointed the reasonable expectations of Plaintiff.

437.   Plaintiff TRD has been deprived of the benefits under the terms of Springhill TSA as a direct consequence of Defendant Springhill's conscious and deliberate conduct thereunder.  As a result, Plaintiff has experienced significant losses.

438.   Pursuant to Section 20 of the Springhill TSA, Plaintiff is entitled to recover its reasonable attorney's fees and costs incurred as a result of Defendant Springhill's breaches of the Springhill TSA.

**WHEREFORE**, Plaintiff TRD respectfully requests that this Court enter judgment for damages against Defendant Springhill including actual damages, reasonable attorneys' fees, costs, pre and post-judgment interest, and such other relief as this Court deems just and proper.

## COUNT XXXVIII –UNJUST ENRICHMENT (PLED IN THE ALTERNATIVE TO COUNT XXXVI)
### (SPRINGHILL)

439.   Plaintiff re-alleges and re-incorporates the allegations contained in paragraphs 1 through 39, 129-134, as if fully set forth herein.

440.   Plaintiff conferred a benefit on Defendant Springhill by, without limitation, providing Rehabilitation Services to patients of the Springhill Facility.

441.   Defendant Springhill received and accepted the benefit conferred on them by Plaintiff.

442.   Defendant Springhill had knowledge of the benefit conferred on it by Plaintiff.

443.   The circumstances are such that it would be inequitable to allow Defendant Springhill to retain the benefits conferred on it by Plaintiff without paying TRD the full value thereof.

**WHEREFORE**, Plaintiff TRD demands judgment against Defendant Springhill for monetary damages, compensatory damages, attorney's fees and costs, treble damages, and for any further relief this Court may deem just and proper.

<u>**COUNT XXXIX – QUANTUM MERUIT (PLED IN THE ALTERNATIVE TO COUNT XXXVI) (SPRINGHILL)**</u>

444.   Plaintiff re-alleges and re-incorporates the allegations contained in paragraphs 1 through 39, 129-134, as if fully set forth herein.

445.   Plaintiff TRD has conferred or caused to be conferred a benefit upon Defendant Springhill including, without limitation, providing Rehabilitation Services to patients of Springhill Facility.

446.   Defendant Springhill accepted the Rehabilitation Services provided to their patients of the Springhill Facility and was aware at all times that TRD expected to be paid for such services.

447.   Under ordinary circumstances, a reasonable person would reasonably expect to pay for such services.

448.   Notwithstanding, Defendant Springhill failed to make payment to TRD for the benefits conferred upon it.

449.   As a result of Defendant Springhill's failure to pay for the above benefits, Plaintiff TRD has been damaged.

**WHEREFORE**, Plaintiff TRD demands judgment against Defendant Springhill for monetary damages, compensatory damages, attorney's fees and costs, treble damages, and for any further relief this Court may deem just and proper.

<div align="center">

**COUNT XL**
**BREACH OF CONTRACT**
**(GREENBRIER)**

</div>

450.    Plaintiff re-alleges and re-incorporates the allegations contained in paragraphs 1 through 150, as if fully set forth herein.

451.    Plaintiff and Defendant Greenbrier entered into the Greenbrier TSA.

452.    Pursuant to the terms of the Greenbrier TSA, Defendant Greenbrier was required to make payment to Plaintiff for Rehabilitation Services provided by TRD to patients of the Greenbrier Facility in accordance with the terms therein.

453.    Notwithstanding Defendant Greenbrier's obligations to make payment to TRD pursuant to the terms of the Greenbrier TSA, Defendant Greenbrier materially breached said contract with Plaintiff by, without limitation, failing to make payment to TRD for Rehabilitation Services rendered thereunder.

454.    As a result of Defendant Greenbrier's material breaches of the Greenbrier TSA, Plaintiff has suffered damages.

455.    Pursuant to Section 20 of the Greenbrier TSA, Plaintiff is entitled to recover its reasonable attorney's fees and costs incurred as a result of Defendant Greenbrier's breaches of the Greenbrier TSA.

**WHEREFORE**, Plaintiff, TRD, respectfully requests that this Court enter

judgment for damages against Defendant Greenbrier, including actual damages, consequential damages, reasonable attorney's fees. costs, pre and post-judgment interest, and such other relief as this Court deems just and proper.

## COUNT XLI– BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (GREENBRIER)

456.   Plaintiff re-alleges and re-incorporates the allegations contained in paragraphs 1 through 150, as if fully set forth herein.

457.   The Greenbrier TSA is a valid and binding contract between Plaintiff TRD and Defendant Greenbrier relating to the providing of Rehabilitation Services by TRD to patients at the Greenbrier Facility.

458.   The Greenbrier TSA requires that Defendant Greenbrier properly comply with all Medicare policies regarding Therapy Services furnished by TRD pursuant to the Greenbrier TSA.

459.   Plaintiff has performed all of its obligations under Greenbrier TSA, including all such conditions precedent for payment thereunder.

460.   Notwithstanding, Defendant Greenbrier has consciously and deliberately refused to comply with its duties owed to Plaintiff under the terms of the Greenbrier TSA including, without limitation, failing to comply with all requisite Medicare policies thereunder, including failing to remit payments to TRD for Rehabilitation Services provided and withholding payments for which Defendant Greenbrier received reimbursement for from Medicare on behalf of its patients at the Greenbrier Facility.

461.    Defendant Greenbrier's conscious and deliberate refusal to abide by the terms of the Greenbrier TSA has unfairly frustrated the agreed common purpose of such therapy services agreement and disappointed the reasonable expectations of Plaintiff.

462.    Plaintiff TRD has been deprived of the benefits under the terms of Greenbrier TSA as a direct consequence of Defendant Greenbrier's conscious and deliberate conduct thereunder.  As a result, Plaintiff has experienced significant losses.

463.    Pursuant to Section 20 of the Greenbrier TSA, Plaintiff is entitled to recover its reasonable attorney's fees and costs incurred as a result of Defendant Greenbrier's breaches of the Greenbrier TSA.

**WHEREFORE**, Plaintiff TRD respectfully requests that this Court enter judgment for damages against Defendant Greenbrier including actual damages, reasonable attorneys' fees, costs, pre and post-judgment interest, and such other relief as this Court deems just and proper.

## COUNT XLII –UNJUST ENRICHMENT (PLED IN THE ALTERNATIVE TO COUNT XL) (GREENBRIER)

464.    Plaintiff re-alleges and re-incorporates the allegations contained in paragraphs 1 through 39, 140-144, as if fully set forth herein.

465.    Plaintiff conferred a benefit on Defendant Greenbrier by, without limitation, providing Rehabilitation Services to patients of the Greenbrier Facility.

466.    Defendant Greenbrier received and accepted the benefit conferred on them by Plaintiff.

467.   Defendant Greenbrier had knowledge of the benefit conferred on it by Plaintiff.

468.   The circumstances are such that it would be inequitable to allow Defendant Greenbrier to retain the benefits conferred on it by Plaintiff without paying TRD the full value thereof.

**WHEREFORE**, Plaintiff TRD demands judgment against Defendant Greenbrier for monetary damages, compensatory damages, attorney's fees and costs, treble damages, and for any further relief this Court may deem just and proper.

## COUNT XLIII – QUANTUM MERUIT (PLED IN THE ALTERNATIVE TO COUNT XL)
## (GREENBRIER)

469.   Plaintiff re-alleges and re-incorporates the allegations contained in paragraphs 1 through 39, 140-144, as if fully set forth herein.

470.   Plaintiff TRD has conferred or caused to be conferred a benefit upon Defendant Greenbrier including, without limitation, providing Rehabilitation Services to patients of Greenbrier Facility.

471.   Defendant Greenbrier accepted the Rehabilitation Services provided to their patients of the Greenbrier Facility and was aware at all times that TRD expected to be paid for such services.

472.   Under ordinary circumstances, a reasonable person would reasonably expect to pay for such services.

473.   Notwithstanding, Defendant Greenbrier failed to make payment to TRD for the benefits conferred upon it.

474.   As a result of Defendant Greenbrier's failure to pay for the above benefits, Plaintiff TRD has been damaged.

**WHEREFORE**, Plaintiff TRD demands judgment against Defendant Greenbrier for monetary damages, compensatory damages, attorney's fees and costs, treble damages, and for any further relief this Court may deem just and proper.

## COUNT XLIV –TORTIOUS INTERFERENCE WITH AN ADVANTAGEOUS BUSINESS RELATIONSHIP (TAPPAHANNOCK)

475.   Plaintiff re-alleges and re-incorporates the allegations contained in paragraphs 1 through 150, as if fully set forth herein.

476.   At all material times hereto, Plaintiff TRD has maintained an advantageous business relationship with Centra Healthcare Solutions, a 3rd party IT service provider including under the Centra Healthcare Agreement.

477.   At all material times hereto, Defendant Tappahannock has had knowledge and otherwise been aware regarding the existence of the advantageous business relationship between Plaintiff and Centra Healthcare Solutions including under the Centra Healthcare Agreement.

478.   Moreover, at all material times hereto, Defendant Tappahannock has had knowledge and otherwise been aware regarding Plaintiff's reliance and use of the payments received pursuant to the Tappahannock TSA to satisfy its obligations owed to Centra Healthcare Solutions.

479.   Notwithstanding the foregoing, Defendant Tappahannock intentionally and unjustifiably interfered with Plaintiff's relationship with Centra Healthcare

Solutions including under the Centra Healthcare Agreement by, without limitation, failing to make payment due to Plaintiff under the terms of the Tappahannock TSA, despite Defendant Tappahannock's knowledge regarding Plaintiff's reliance on same to maintain its business relationship with Centra Healthcare Solutions.

480.   As a result of Defendant Tappahannock's intentional and unjustified interference with Plaintiff's relationship with Centra Healthcare Solutions, Plaintiff has suffered damages.

**WHEREFORE**, Plaintiff, TRD, respectfully requests that this Court enter judgment for damages against Defendant Tappahannock, including actual damages, consequential damages, costs, pre and post-judgment interest, and such other relief as this Court deems just and proper.

## COUNT XLV–TORTIOUS INTERFERENCE WITH AN ADVANTAGEOUS BUSINESS RELATIONSHIP (TAPPAHANNOCK)

481.   Plaintiff re-alleges and re-incorporates the allegations contained in paragraphs 1 through 150, as if fully set forth herein.

482.   At all material times hereto, Plaintiff TRD has maintained an advantageous business relationship with CoreMedical Group, a 3rd party medical staffing company including under the CoreMedical Agreement.

483.   At all material times hereto, Defendant Tappahannock has had knowledge and otherwise been aware regarding the existence of the advantageous business relationship between Plaintiff and CoreMedical Group including under the CoreMedical Agreement.

484.   Moreover, at all material times hereto, Defendant Tappahannock has had knowledge and otherwise been aware regarding Plaintiff's reliance and use of the payments received pursuant to the Tappahannock TSA to satisfy its obligations owed to CoreMedical Group including under the CoreMedical Agreement.

485.   Notwithstanding the foregoing, Defendant Tappahannock intentionally and unjustifiably interfered with Plaintiff's relationship with CoreMedical Group by, without limitation, failing to make payment due to Plaintiff under the terms of the Tappahannock TSA, despite Defendant Tappahannock's knowledge regarding Plaintiff's reliance on same to maintain its business relationship with CoreMedical Group including under the CoreMedical Agreement.

486.   As a result of Defendant Tappahannock's intentional and unjustified interference with Plaintiff's relationship with CoreMedical Group including under the CoreMedical Agreement, Plaintiff has suffered damages.

**WHEREFORE**, Plaintiff, TRD, respectfully requests that this Court enter judgment for damages against Defendant Tappahannock, including actual damages, consequential damages, costs, pre and post-judgment interest, and such other relief as this Court deems just and proper.

## COUNT XLVI–TORTIOUS INTERFERENCE WITH AN ADVANTAGEOUS BUSINESS RELATIONSHIP (BOTETOURT)

487.   Plaintiff re-alleges and re-incorporates the allegations contained in paragraphs 1 through 150, as if fully set forth herein.

117

488.   At all material times hereto, Plaintiff TRD has maintained an advantageous business relationship with Fusion Medical Staffing, LLC, a 3rd party medical staffing company including under the Fusion Medical Agreement.

489.   At all material times hereto, Defendant Botetourt has had knowledge and otherwise been aware regarding the existence of the advantageous business relationship between Plaintiff and Fusion Medical Staffing, LLC, including under the Fusion Medical Agreement.

490.   Moreover, at all material times hereto, Defendant Botetourt has had knowledge and otherwise been aware regarding Plaintiff's reliance and use of the payments received pursuant to the Botetourt TSA to satisfy its obligations owed to Fusion Medical Staffing, LLC, including under the Fusion Medical Agreement.

491.   Notwithstanding the foregoing, Defendant Botetourt intentionally and unjustifiably interfered with Plaintiff's relationship with Fusion Medical Staffing, LLC by, without limitation, failing to make payment due to Plaintiff under the terms of the Botetourt TSA, despite Defendant Botetourt's knowledge regarding Plaintiff's reliance on same to maintain its business relationship with Fusion Medical Staffing, LLC, including under the Fusion Medical Agreement.

492.   As a result of Defendant Botetourt's intentional and unjustified interference with Plaintiff's relationship with Fusion Medical Staffing, LLC, including under the Fusion Medical Agreement, Plaintiff has suffered damages.

**WHEREFORE**, Plaintiff, TRD, respectfully requests that this Court enter judgment for damages against Defendant Botetourt, including actual damages,

consequential damages, costs, pre and post-judgment interest, and such other relief as this Court deems just and proper.

## COUNT XLVII–TORTIOUS INTERFERENCE WITH AN ADVANTAGEOUS BUSINESS RELATIONSHIP (BOTETOURT)

493.   Plaintiff re-alleges and re-incorporates the allegations contained in paragraphs 1 through 150, as if fully set forth herein.

494.   At all material times hereto, Plaintiff TRD has maintained an advantageous business relationship with Jackson Therapy Partners, LLC, a 3rd party medical staffing company including under the Jackson Therapy Agreement.

495.   At all material times hereto, Defendant Botetourt has had knowledge and otherwise been aware regarding the existence of the advantageous business relationship between Plaintiff and Jackson Therapy Partners, LLC, including under the Jackson Therapy Agreement.

496.   Moreover, at all material times hereto, Defendant Botetourt has had knowledge and otherwise been aware regarding Plaintiff's reliance and use of the payments received pursuant to the Botetourt TSA to satisfy its obligations owed to Jackson Therapy Partners, LLC, including under the Jackson Therapy Agreement.

497.   Notwithstanding the foregoing, Defendant Botetourt intentionally and unjustifiably interfered with Plaintiff's relationship with Jackson Therapy Partners, LLC by, without limitation, failing to make payment due to Plaintiff under the terms of the Botetourt TSA, despite Defendant Botetourt's knowledge regarding Plaintiff's

reliance on same to maintain its business relationship Jackson Therapy Partners, LLC, including under the Jackson Therapy Agreement.

498.   As a result of Defendant Botetourt's intentional and unjustified interference with Plaintiff's relationship with Jackson Therapy Partners, LLC, including under the Jackson Therapy Agreement, Plaintiff has suffered damages.

**WHEREFORE**, Plaintiff, TRD, respectfully requests that this Court enter judgment for damages against Defendant Botetourt, including actual damages, consequential damages, costs, pre and post-judgment interest, and such other relief as this Court deems just and proper.

## <u>RESERVATION OF RIGHTS</u>

Plaintiff hereby reserves the right to amend this pleading as discovery progresses.

## <u>JURY DEMAND</u>

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: February 20, 2024          **LEWIS BRISBOIS BISGAARD & SMITH LLP**

*Counsel for Plaintiff*
110 Southeast Sixth Street, Suite 2600
Fort Lauderdale, Florida 33301
Telephone: (954) 728-1280
Facsimile: (954) 678-4090
E-Service: ftlemaildesig@lewisbrisbois.com

By:/s/ David H. Haft
        David H. Haft, Esq.
        Florida Bar No.: 68992
        david.haft@lewisbrisbois.com
        Pedro Stefan Quintana, Esq.
        Florida Bar No.: 1026411
        pedro.quintana@lewisbrisbois.com